**COMMITTEE FOR AUTO RESPONSI-
BILITY (C.A.R.) et al., Appellants,**

v.

**Jay SOLOMON et al., Appellees.**

**No. 77–1160.**

United States Court of Appeals,
District of Columbia Circuit.

Argued June 6, 1978.

Decided July 24, 1979.

Rehearing Denied Aug. 22, 1979.

Joel D. Joseph, Washington, D. C., with whom Paul D. Kamenar, Washington, D. C., was on brief, for appellants.

Kenneth M. Raisler, Asst. U. S. Atty., Washington D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellees. Steven D. Gordon, Asst. U. S. Atty., and Sarah W. Wilcox, Atty., Dept. of Justice, Washington, D. C., also entered appearances for appellees.

Before ROBINSON and WILKEY, Circuit Judges, and FLANNERY,* United States District Judge for the United States District Court for the District of Columbia.

Opinion for the Court filed PER CURIAM.

PER CURIAM:

█ This litigation embodies a challenge to the leasing by the General Services Administration (GSA) of the Great Plaza area of the Federal Triangle in Washington, D. C., for use as a parking facility for employees of federal agencies.[1] Two grounds of attack are advanced. One is that the National Environmental Policy Act of 1969 (NEPA)[2] requires an environmental impact statement (EIS) prior to leasing. The other is that GSA is violating the Public Buildings Amendments of 1972[3] by charging the

---

\* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. Appellants state in very general terms that their suit is directed at the "operation" of the Great Plaza parking facility. Brief for Appellants at 3. In order to allege a violation of NEPA, however, appellants must challenge major federal action significantly affecting the quality of the human environment. See notes 33–49 *infra* and accompanying text. In the instant case, the only event that even arguably can be considered a major federal action is GSA's decision to lease the Great Plaza area for vehicular parking. We thus assume that it is this decision that is being attacked by appellants.

The District Court did not focus on GSA's lease, but instead centered its analysis on a reassignment by GSA of parking spaces among government employees, which occurred three days before appellants filed suit on November 7, 1976. The District Court found that the reassignment was not a major federal action requiring an EIS. See note 30 *infra*. While agreeing with this conclusion, we think it more fruitful to focus on the lease itself, to which assignments and reassignments of parking spaces are incidental.

2. Pub.L. No. 91–190, 83 Stat. 852 (1970), 42 U.S.C. §§ 4321–4361 (1976), as amended by Pub.L. No. 94–52, 89 Stat. 258 (1975); Pub.L. No. 94–83, 89 Stat. 424 (1975); Pub.L. No. 94–475, 90 Stat. 2071 (1976) [hereinafter cited as codified]. The purposes of NEPA are

[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

42 U.S.C. § 4321 (1976). NEPA ordains that all agencies of the Federal Government shall

. . . include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C) (1976).

3. Section 4 of the Public Buildings Amendments of 1972, Pub.L. No. 92–313, 86 Stat. 219 (1976), 40 U.S.C. §§ 490(j), (k) (1976) [hereinafter cited as codified], amended § 210 of the Federal Property and Administrative Services Act of 1949, Pub.L. No. 81–152, 63 Stat. 378 (1949), current version at 40 U.S.C. §§ 471 *et seq.* (1976). The Federal Property and Administrative Services Act of 1949 states that:

It is the intent of the Congress in enacting this legislation to provide for the Government an economical and efficient system for (a) the procurement and supply of personal property and nonpersonal services . . .; (b) the utilization of available property; (c) the disposal of surplus property; and (d) records management.

40 U.S.C. § 471 (1976).

Section 4 of the Public Buildings Amendments of 1972, 40 U.S.C. § 490(j), (k) (1976), added two new subsections to the 1949 Act. Only subsection (j) bears on the instant litigation, and it states:

The Administrator is authorized and directed to charge anyone furnished services, space, quarters, maintenance, repair, or other facilities (hereinafter referred to as space and services), at rates to be determined by the Administrator from time to time and provided for in regulations issued by him. Such rates and charges shall approximate commercial charges for comparable space and services.

employee only a portion of the commercial parking rate and assessing the difference to the employee's agency.

Appellants are the Committee for Auto Responsibility and the Metropolitan Washington Coalition for Clean Air,[4] two organizations whose purposes include improvement of the quality of the environment, together with three individuals who live and attend school in the District of Columbia. The Great Plaza area is owned by the Federal Government, and since the 1930's has been leased to parking management firms for periods of approximately four years.[5] It is now leased to Parking Management, Inc., a private corporation, for a four-year term that began on May 15, 1976.[6] Under the current lease, nearly three-fourths of the parking spaces are reserved during business hours for the use of permit-holding federal employees. Since 1972, permits have been assigned only to employees who carpool.[7]

The District Court denied appellants' request for declaratory and injunctive relief

and dismissed their action.[8] They now assert that procedural and substantive errors infected the proceedings before that court. GSA opposes their arguments and insists further that appellants lack standing. Perceiving no reversible error, we affirm.

## I. STANDING

■ To possess standing to attack GSA's failure to prepare an EIS, appellants must show that they have been "adversely affected" or "aggrieved" within the meaning of Section 10 of the Administrative Procedure Act (APA).[9] That section confers standing only upon those to whom the challenged agency conduct has caused actual injury to an interest within the zone of interests protected by the statute allegedly violated.[10] Section 10 calls additionally upon a party to allege an "injury that fairly can be traced to the challenged action of the defendant, and not injury that results from an independent action of some third party not before the court." [11]

40 U.S.C. § 490(j) (1976).

4. Committee for Auto Responsibility is an unincorporated association whose primary purpose is to improve the quality of the human environment by promoting responsible use of automobiles and public land in ways that minimize adverse environmental effects and conserve finite resources. The Metropolitan Washington Coalition for Clean Air is a nonprofit corporation devoted to the preservation and enhancement of environmental values in the District of Columbia metropolitan area. Its membership consists of approximately 900 citizens in the area. Brief for Appellants at 5–6.

5. Appendix to Appellant's Brief (App.) 20.

6. Brief for Appellees at 3.

7. Brief for Appellees at 4.

8. *Committee for Auto Responsibility v. Eckerd,* Civ. No. 76–2084 (D.D.C. Dec. 6, 1976) (order denying injunctive relief and dismissing complaint), App. 16.

9. Section 10 of the Administrative Procedure Act, Pub.L. No. 89–554, 80 Stat. 392 (1966), 5 U.S.C. § 702 (1976), provides:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

10. *United States v. SCRAP,* 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254, 269 (1973); *Sierra Club v. Morton (Mineral King),* 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636, 642 (1972); *Data Processing Serv. v. Camp,* 397 U.S. 150, 152–153, 90 S.Ct. 827, 829–830, 25 L.Ed.2d 184, 188 (1970); *Barlow v. Collins,* 397 U.S. 159, 164, 90 S.Ct. 832, 836, 25 L.Ed.2d 192, 198 (1970); *Coalition for Environment v. Volpe,* 504 F.2d 156, 165 (8th Cir. 1974).

11. *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450, 462 (1976). In *Simon,* the plaintiffs alleged that a particular revenue ruling adopted by the Internal Revenue Service and the Treasury Department encouraged hospitals to deny medical services to indigents. The Court held that while the plaintiffs may have alleged injury in fact—the denial of medical services—they had failed to show that this injury was traceable to the actions of the defendants, officials of IRS and the Department. *Id.* at 41–43, 96 S.Ct. at 1925–1926, 48 L.Ed.2d at 462–463. See also *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 74–78, 98 S.Ct. 2620, 2631–2633, 57 L.Ed.2d 595, 612–614 (1978); *Warth v. Seldin,* 422 U.S. 490, 506–507, 95 S.Ct. 2197, 2209, 45 L.Ed.2d 343, 359 (1975); *Linda R.S. v. Richard D.,* 410 U.S. 614, 618, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536, 541 (1973); *Southern Mut. Help Ass'n v. Califano,* 187 U.S.App.D.C. 307, 312–313, 574

■ We think appellants have satisfied standing requirements to charge violations of NEPA but not of the Public Buildings Amendments of 1972.[12] Appellants claim that they or their members [13] live in or near the District of Columbia and regularly travel to educational, cultural and recreational facilities within the immediate vicinity of the Great Plaza. They assertedly are affected by noise, air pollution and congestion from vehicles utilizing the Great Plaza parking lot.[14] Harm to health and conservational interests of parties seeking judicial review is enough to meet the injury-in-fact test for standing,[15] and interests of those sorts are clearly within the zone of protection afforded by NEPA.[16]

■ Appellants have shown, moreover, that their injury can be traced to GSA's

F.2d 518, 523–524 (1977); *Animal Welfare Inst. v. Kreps,* 183 U.S.App.D.C. 109, 116–117, 561 F.2d 1002, 1009–1010, *cert. denied,* 434 U.S. 1013, 98 S.Ct. 726, 54 L.Ed.2d 756 (1977).

12. In the District Court, GSA did not challenge appellants' standing. On the initiative of this court, the standing question was argued on appeal.

13. An association has standing to bring suit on behalf of its members when the members would otherwise have standing to sue in their own right, the interests the organization seeks to protect are germane to its purposes, and neither the claim asserted nor the relief requested requires the individual participation of the members in the lawsuit. *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 343–344, 97 S.Ct. 2434, 2441–2442, 53 L.Ed.2d 383, 394 (1977); *Simon v. Eastern Ky. Welfare Rights Organization, supra* note 11, 426 U.S. at 39–40, 96 S.Ct. at 1924–1925, 48 L.Ed.2d at 461–462; *Warth v. Seldin, supra* note 11, 422 U.S. at 511, 95 S.Ct. at 2211–2212, 45 L.Ed.2d at 362; *NAACP v. Alabama,* 357 U.S. 449, 458–460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488, 1497–1498 (1958).

The prerequisites to associational standing are clearly met in this litigation. Committee for Auto Responsibility and Metropolitan Washington Coalition for Clean Air allege that health and conservational values of their members have been impaired by GSA's failure to prepare an EIS. See notes 14–16 *infra* and accompanying text. These values to members are interests germane to the objectives of both organizations. See note 4 *supra.* The declaratory and injunctive relief sought by these two organizations does not require individualized proof, and can be properly resolved in a group context.

14. Brief for Appellants at 5.

15. *United States v. SCRAP, supra* note 10, 412 U.S. at 684–690, 93 S.Ct. at 2414–2417, 37 L.Ed.2d at 268–271; *Environmental Defense Fund v. Hardin,* 138 U.S.App.D.C. 391, 394–395, 428 F.2d 1093, 1096–1097 (1970); *Coalition for Environment v. Volpe, supra* note 10, 504 F.2d at 167; *Alameda Conservation Ass'n v. California,* 437 F.2d 1087, 1091 (9th Cir.), *cert. denied,* 402 U.S. 908, 91 S.Ct. 1380, 28 L.Ed.2d 649 (1971); *Harlem Valley Transport. Ass'n v. Stafford,* 360 F.Supp. 1057, 1064 (S.D. N.Y.1973), *aff'd,* 500 F.2d 328 (2d Cir. 1974). Even though pollution allegedly caused by the challenged conduct may affect all people in the surrounding area, a small group of those affected by the pollution can still attack that conduct in court. *United States v. SCRAP, supra* note 10, 412 U.S. at 686–688, 93 S.Ct. at 2415, 37 L.Ed.2d at 269–270; *Sierra Club v. Morton (Mineral King), supra* note 10, 405 U.S. at 734, 92 S.Ct. at 1366, 31 L.Ed.2d at 643. See *Duke Power Co. v. Carolina Environmental Study Group, Inc., supra* note 11. As the Supreme Court has stated:

> Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process. *Sierra Club v. Morton (Mineral King), supra* note 10, 405 U.S. at 734, 92 S.Ct. at 1366, 31 L.Ed.2d at 643.

16. *United States v. SCRAP, supra* note 10, 412 U.S. at 687 n.13, 93 S.Ct. at 2415 n.13, 37 L.Ed.2d at 269 n.13; *Robinson v. Knebel,* 550 F.2d 422, 425 (8th Cir. 1977); *Cady v. Morton,* 527 F.2d 786, 791–792 (9th Cir. 1975); *Harlem Valley Transport. Ass'n v. Stafford, supra* note 15, 360 F.Supp. at 1064; *James River v. Richmond Metropolitan Auth.,* 359 F.Supp. 611, 625 (E.D.Va.), *aff'd,* 481 F.2d 1280 (4th Cir. 1973); *Save the Courthouse Comm. v. Lynn,* 408 F.Supp. 1323, 1332–1333 (S.D.N.Y.1975). The appellants' interest in a healthful and aesthetic environment is recognized in NEPA's congressional declaration of national environmental policy. NEPA states that

> it is the continuing responsibility of the Federal Government to use all practicable means, . . . [to] assure for all Americans safe, healthful, productive, and aesthetically, and culturally pleasing surroundings [and] attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences . . . .

42 U.S.C. § 4331(b)(2), (3) (1976).

failure to prepare an EIS.[17] Their complaint avers that had GSA done so, it would have had to assess the adverse environmental effects of leasing the Great Plaza area under an arrangement offering parking spaces to federal employees for fees less than commercial rates.[18] In its EIS, GSA would also have had to consider alternatives to the leasing agreement,[19] such as charging permit holders a commercial rate for parking, offering subsidies to those who use mass transit, or restricting the area to non-parking uses.[20] Such an approach, according to appellants' complaint, would have ensured that the use of the Great Plaza does not contribute unnecessarily to noise and air pollution in the surrounding area. These allegations are sufficient to confer standing upon appellants to challenge GSA's omission of an EIS.

 To litigate their remaining claim, it was incumbent upon appellants to show that they have been "adversely affected" by GSA's alleged violations of the Public Buildings Amendments of 1972. While appellants have urged that their health and conservational values are similarly diminished by GSA's failure to exact commercial parking rates from federal employees,[21] it seems clear that these asserted losses fall well outside the zone safeguarded by the Amendments.[22] The purpose of the Amendments is to provide the Government with an economical and efficient system for the procurement, utilization and disposal of property.[23] Health and conservational concerns, which indubitably underlie NEPA, are not among those that Congress arguably sought to accommodate by enactment of the Public Buildings Amendments of 1972. We hold that appellants do not have standing to challenge the asserted infringement of the Amendments.[24]

## II. THE DISTRICT COURT'S PROCEDURES

 Appellants charge the District Court with procedural error, stating that it did not treat GSA's motion to dismiss as a

17. See note 11 *supra.*

18. NEPA requires that an EIS detail the environmental impact of the proposed action, and any adverse environmental effects that cannot be avoided should the proposal be implemented. 42 U.S.C. § 4332(2)(C)(i) and (ii) (1976). See note 2 *supra.*

19. An EIS must also analyze alternatives to the proposed action. 42 U.S.C. § 4332(2)(C)(iii) (1976). See note 2 *supra.*

20. Brief for Appellants at 3–4.

21. See notes 2–4 and accompanying text *supra.*

22. A party will be denied standing if his alleged injury is to an interest that is not arguably within the zone of interests protected by the statute in question, even though injury in fact has been sufficiently established. *Tax Analysts & Advocates v. Blumenthal,* 184 U.S.App.D.C. 238, 566 F.2d 130 (1977); *Colligan v. Activities Club of New York, Ltd.,* 442 F.2d 686, 691–692 (2d Cir.), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971); *Sissons v. Office of Selective Serv.,* 454 F.2d 279 (9th Cir. 1972); *Window Sys., Inc. v. Manchester Memorial Hosp.,* 424 F.Supp. 331, 338 (D.Conn.1976). But see *Ballerina Pen Co. v. Kunzig,* 140 U.S. App.D.C. 98, 101, 433 F.2d 1204, 1207 (1970), *cert. denied sub nom. National Indus. for the Blind v. Ballerina Pen Co.,* 401 U.S. 950, 91

S.Ct. 1186, 28 L.Ed.2d 234 (1971); *Scanwell Laboratories, Inc. v. Shaffer,* 137 U.S.App.D.C. 371, 424 F.2d 859 (1970).

23. While no general statement of policy was adopted with the 1972 Amendments, a general statement of legislative purpose can be found in the statute amended, the Federal Property and Administrative Services Act of 1949, 40 U.S.C. §§ 471 *et seq.* (1976). See note 3 *supra.* Examination of a general statement of congressional policy to delineate the zone of interests preserved by the statute is appropriate where the general provision and the particular provision allegedly violated share an "identity of purpose." *Tax Analysts & Advocates v. Blumenthal, supra* note 22, 184 U.S.App.D.C. at 249, 566 F.2d at 141; *Constructores Civiles de Centroamerica, S.A. v. Hannah,* 148 U.S.App. D.C. 159, 164–165, 459 F.2d 1183, 1188–1189 (1972). Clearly, these two provisions share an identity of purpose since the Federal Property and Administrative Services Act of 1949, like its subsequent amendments, was not intended to achieve a wide variety of economic and social goals, but simply to accomplish an efficient allocation of government space. See note 3 *supra.*

24. Alternatively, we conclude that this challenge fails also on the merits. See Part IV *infra.*

motion for summary judgment. They argue that whenever a federal trial court considers matters outside the pleadings in ruling on a motion to dismiss, the motion must be treated as one for summary judgment.[25] Appellants also point to GSA's failure to file its motion to dismiss at least ten days prior to what it says was a hearing thereon.[26]

We have no quarrel with appellants' view of adjective law. But, contrary to appellants' position,[27] the session held by the District Court was devoted to appellants' motion for a preliminary injunction and the merits of its case for a permanent injunction,[28] matters previously consolidated for hearing.[29] The court thus did not deal with GSA's motion to dismiss, but rather examined the relief appellants sought, denied their request, and finding none other appropriate to grant, properly dismissed the complaint.[30]

Moreover, appellants have not alleged any prejudice resulting from the course taken by the District Court. All parties were given three weeks' notice of the consolida-

25. Appellants rely primarily on Fed.R.Civ.P. 12(b), which states:

If, on a motion . . . to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

26. Had GSA's motion been for summary judgment, as appellants argue, it would have called into play Fed.R.Civ.P. 56(c), providing that it be served at least ten days before the date of the hearing. Appellants also note that the District Court's Rule 1–9(d) specifies that a party opposing a motion shall have ten days from the date of service to file a statement in opposition to the motion. Since the hearing before the court concerned *appellants'* motions for injunctive relief and not *GSA's* motion to dismiss, we find that appellants were not prejudiced when GSA filed its motion only six days prior to the hearing. See also note 28 *infra*.

27. Appellants incorrectly argue, Brief for Appellants at 10, that the District Court's hearing concerned GSA's motion to dismiss.

28. The District Court, in its preparatory remarks, clearly informed both parties of the hearing's purpose, Transcript (Tr.) 2, App. 5, and throughout the hearing counsel for both parties focused their arguments on appellants' applications for preliminary and permanent injunctive relief. As counsel for GSA noted during the hearing:

Plaintiffs ask for an injunction against the assignment and the effectiveness of the assignment of the parking places of the Great Plaza lot. Those issues are moot since both the assignment and the effectiveness of the assignment have been accomplished.

They also ask that all parking in the lot be enjoined. As our papers point out, there is no legal basis for doing so.

Tr. at 10, App. for Appellants at 13.

Appellants' reliance on Fed.R.Civ.P. 12(b), therefore, is misplaced since the applicability of the rule is triggered only when a court considers a party's motion to dismiss and reaches a decision thereon. See *Carter v. Stanton*, 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972), cited by appellants, where the Court remanded the case because the trial court, *at a preliminary hearing on a motion to dismiss*, received matters outside of the pleadings.

29. Fed.R.Civ.P. 65(a)(2) states:

Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application.

30. At the conclusion of the hearing on the merits, the District Court informed the parties of its findings. The court found that

PMI is an indispensable party to this action; and not having been made so, it justifies dismissal.

In addition to that, the Court holds that the reassignment of these parking spaces is not a major federal action which requires an environmental impact statement.

The Court further is of the view, particularly after studying the legislative history of 4490 [40 U.S.C. § 490] that the action in this case of the government complies with the sections of 4490(j) and (k) [40 U.S.C. §§ 490(j) and (k)], when read together. . .

The Court will, therefore, deny the motion for preliminary and permanent injunction, and will dismiss the complaint.

Hearing Transcript (Tr.) at 11–12, App. 14–15. In view of our resolution of other issues, we find it unnecessary to review the court's decision to dismiss the action for failure to join an indispensable party.

tion,[31] and must have understood that the hearing on the preliminary and permanent injunctive relief was meant to be their final day in court.[32] Appellants' argument of reversible procedural error must be rejected.

### III. THE LEASE AND MAJOR FEDERAL ACTION

The central issue on appeal is whether GSA's decision to lease the Great Plaza area to a parking management firm was a major federal action significantly affecting the environment.[33] GSA, in an "environmental analysis"[34] prepared before it entered into the 1976 lease, found that "[t]he continued use of the Great Plaza Parking Lot will not degrade air quality from the present level, since the pollutants generated by the cars using the parking lot are already included in the present level."[35] GSA concluded that "[t]he leasing of the Great Plaza Parking Lot to a parking management firm for a period of four years, is not considered to be a major Federal action which would significantly affect the quality of the human environment."[36] Appellants respond by contending that the approximately 1,800 vehicles utilizing the lot daily contribute pollutants that significantly degrade local air quality.[37] Since "GSA's [parking] program continues to harm the

---

**31.** Brief for Appellees at 16–17.

**32.** *Crumble v. Blumenthal,* 549 F.2d 462, 466 (7th Cir. 1977). See also *Singleton v. Anson County Bd. of Educ.,* 387 F.2d 349 (4th Cir. 1967); *Puerto Rican Farm Workers v. Eatman,* 427 F.2d 210 (5th Cir. 1970); 7 Moore's Fed. Practice ¶ 65.04[4] (2d ed. 1978).

**33.** NEPA is activated only by actions of that nature. See note 2 *supra.*

**34.** "Environmental Analysis-Outlease of Great Plaza Parking Lot, Washington, D.C.," reprinted in App. 19–28, [hereinafter cited as "Environmental Analysis"].

**35.** Environmental Analysis, App. 23. This report also noted that the level of pollutants may have declined in recent years because of the institution of a carpool-priority system which has increased the average occupancy per vehicle:

> The continued use of the Great Plaza Parking Lot will not degrade air quality from the present level, since the pollutants generated by the cars using the parking lot are already included in the present level.
> Furthermore, GSA's mandatory carpool requirements are increasing the average vehicle occupancy of the cars using the lot. For example, the average occupancy per vehicle has increased from 4.27 in the initial assignment effort in 1974 to 4.6 in the most recent reissuance of permits.
> This increase in vehicle occupancy means people who were using alternative modes of transportation, either mass transit or automobile, are now carpooling. Consequently, the overall vehicle miles traveled has been reduced by the amount of mileage traveled by those who gave up driving alone and joined carpools. However, the amount of this reduction has not been calculated.

*Id.* (footnote omitted).

**36.** Environmental Analysis, App. 26.

**37.** In support of their argument, appellants cite GSA's Environmental Analysis, which states:

> There will be a continuation of the temporary adverse impacts relative to the operation of the Parking Lot. These impacts will last as long as the site is used as a parking lot; and are primarily a continuation of pollutants contributed to air quality by the vehicles using the parking lot and a continuation of the congestion on surrounding streets contributed to the vehicles using the parking lot.

Environmental Analysis, App. 24.
Appellants urge, in the alternative, that even if operation of the Great Plaza parking lot is not major federal action, then the "federal parking program as a whole" must be action of that character, since the cumulative effect of all federal parking lots will have a significant impact on the environment. Brief for Appellants at 17. The record, however, does not support appellants' claim that GSA has a national or areawide parking plan, and that is a matter beyond the range of judicial notice. Such a plan would be a necessary predicate for NEPA's requirement of an EIS. See *Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), where the Court held that a regional EIS on coal-related operations is not required if a regional plan or program does not exist. The Court stated that

> respondents' desire for a regional environmental impact statement cannot be met for practical reasons. In the absence of a proposal for a regional plan of development, there is nothing that could be the subject of the analysis envisioned by the statute for an impact statement.

*Id.* at 401, 96 S.Ct. at 2726, 49 L.Ed.2d at 585. Moreover, even if a national or areawide parking program did exist, appellants have failed to show federal "action" taken with respect to that program. See note 2 *supra.*

environment," appellants maintain, an EIS must be prepared even though the leasing arrangement is a continuing project.[38]

An agency commencing federal action has the initial and primary responsibility for ascertaining whether an EIS is required.[39] An initial agency determination on this matter is judicially vulnerable only when the agency has abused its discretion or has acted arbitrarily.[40] This standard of review notwithstanding, a court is obligated to make sure that the agency took a "hard look" at the environmental consequences of its decision.[41]

In the instant case, we cannot say that GSA acted unreasonably in concluding that its decision to lease the Great Plaza area to a parking management firm was not major federal action significantly affecting the environment. We are informed that GSA ascertains the parking needs at each federal building and project on a case-by-case basis,[42] and that if GSA determines that an EIS must be developed in any specific instance, the parking plans for that project will be considered in the EIS.[43] An agency decision to consider jointly the environmental consequences of a federal project and its adjacent parking facility is not an unreasonable interpretation of the NEPA mandate.[44]

The duty to prepare an EIS normally is triggered when there is a proposal

38. Brief for Appellants at 14.

39. *Kleppe v. Sierra Club, supra* note 37, 427 U.S. at 412–414, 96 S.Ct. at 2731–2732, 49 L.Ed.2d at 591–593 (1976); *Scientists' Inst. for Public Information, Inc. v. Atomic Energy Comm'n,* 156 U.S.App.D.C. 395, 410, 481 F.2d 1079, 1094 (1973); *Morningside Renewal Council v. Atomic Energy Comm'n,* 482 F.2d 234, 238 (2d Cir. 1973); *Image of Greater San Antonio v. Brown,* 570 F.2d 517, 522 (5th Cir. 1978); *First Nat'l Bank of Chicago v. Richardson,* 484 F.2d 1369, 1380–1381 (7th Cir. 1973).

40. As the Supreme Court has recently noted:
 The determination of the region, if any, with respect to which a comprehensive statement is necessary requires the weighing of a number of relevant factors, including the extent of the interrelationship among proposed actions and practical considerations of feasibility. Resolving these issues requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies. . . . Absent a showing of arbitrary action, we must assume that the agencies have exercised this discretion appropriately.
 *Kleppe v. Sierra Club, supra* note 37, 427 U.S. at 412, 96 S.Ct. at 2731, 49 L.Ed.2d at 591 (citation omitted). See also *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council,* 435 U.S. 519, 554–555, 98 S.Ct. 1197, 1217, 55 L.Ed.2d 460, 486 (1978); *Calvert Cliffs Coordinating Comm. v. United States Atomic Energy Comm'n,* 146 U.S.App.D.C. 33, 39, 449 F.2d 1109, 1115 (1971); *Hanly v. Kleindienst,* 471 F.2d 823, 828–829 (2d Cir. 1972), *cert. denied,* 412 U.S. 980, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973); *Nucleus of Chicago Home Owners Ass'n v. Lynn,* 524 F.2d 225, 229–230 (7th Cir. 1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976); *Robinson v. Kneble, supra* note 16, 550 F.2d at 427.

41. *Kleppe v. Sierra Club, supra* note 37, 427 U.S. at 410 n. 21, 96 S.Ct. at 2730 n. 21, 49 L.Ed.2d at 590 n. 21; *Maryland-Nat'l Capitol Park & Planning Comm'n v. United States Postal Serv.,* 159 U.S.App.D.C. 158, 169, 487 F.2d 1029, 1040 (1973); *Fund for Animals v. Frizzell,* 402 F.Supp. 35, 37 (D.D.C.1975), *aff'd,* 174 U.S.App.D.C. 130, 530 F.2d 982 (1976). *Cf. Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971); *Wait Radio v. FCC,* 135 U.S.App.D.C. 317, 321, 418 F.2d 1153, 1157 (1969), *later appeal,* 148 U.S.App.D.C. 179, 180, 459 F.2d 1203, 1204, *cert. denied,* 409 U.S. 1027, 93 S.Ct. 461, 34 L.Ed.2d 321 (1972).

42. Brief for Appellees at 23.

43. *Id.* The record does not disclose whether an EIS was prepared on the environmental impact of the Federal Triangle facilities. It is unlikely, however, that it was since that project was completed long before NEPA became effective.

44. Since a federal building or project usually generates a need for automobile parking, it is reasonable to assess parking and related problems—such as congestion and noise and air pollution—when the project itself is subject to an EIS. That approach strikes us as a suitable means of meeting the Council of Environmental Quality's regulations, which state:
 The statutory clause "major Federal actions significantly affecting the quality of the human environment" is to be construed by agencies with a view to the overall, cumulative impact of the action proposed, related Federal actions and projects in the area, and further actions contemplated.
 40 C.F.R. § 1500.6(a) (1977).

to change the status quo.[45] GSA has clearly shown in the information provided in its environmental analysis [46] that current leasing of the Great Plaza area to a parking management firm does not alter the status quo ante.[47] Without a change in parking policy concerning the Great Plaza area there is no proposal for major federal action significantly affecting the environment.[48]

■ To compel GSA to formulate an EIS under these circumstances would trivialize NEPA's EIS requirement and diminish its utility in providing useful environmental analysis for major federal actions that truly affect the environment. NEPA's call for an EIS is governed by the rule of reason,[49] and that rule was not transgressed by GSA's failure to prepare an EIS prior to leasing the Great Plaza area to a parking management firm in 1976.

## IV. THE PUBLIC BUILDINGS AMENDMENT OF 1972

As we have stated, appellants also charge that the GSA parking program at Great Plaza violates Section 490(j) of the Public Buildings Amendments of 1972 [50] by allocating parking fees between federal employees and their respective agencies.[51] Appellants argue that the full fee should be paid by employees because, they say, as "users" of the parking spaces they must pay appropriate commercial charges to comply with Section 490(j).[52] We have held that appellants lack standing to challenge violations of this legislation.[53] We now add, alternatively, that there is no merit in their contentions.

■ GSA disagrees with appellants' reading of Section 490(j), and its interpretation is entitled to great weight in a review-

**45.** In *Andrus v. Sierra Club,* —— U.S. ——, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979), the Supreme Court ruled that NEPA does not require federal agencies to prepare EIS's accompanying appropriation requests, since such requests are neither "proposals for legislation" nor "proposals for . . . major federal action" for purposes of § 102(2)(C), 42 U.S.C. § 4332(2)(C) (1976), quoted in note 2 *supra.*

**46.** To ensure the agency's understanding of the statutory standards and its adequate consideration of the problem, we deem it important that the agency state its reasons for not preparing an EIS. *Asphalt Roofing Ass'n v. ICC,* 186 U.S.App.D.C. 1, 12, 567 F.2d 994, 1005 (1977); *Maryland-Nat'l Capitol Park & Planning Comm'n v. United States Postal Serv., supra* note 41, 159 U.S.App.D.C. at 168–169, 487 F.2d at 1039–1040; *Arizona Pub. Serv. Co. v. FPC,* 157 U.S.App.D.C. 272, 279, 483 F.2d 1275, 1282 (1973); *Scientists' Inst. for Public Information, Inc. v. Atomic Energy Comm'n, supra* note 39, 156 U.S.App.D.C. at 410–411, 481 F.2d at 1094–1095; *Hanly v. Kleindienst, supra* note 40, 471 F.2d at 835–836. Here we find the information provided by GSA in its Environmental Analysis sufficient to meet this demand.

**47.** A revision or expansion of an agency program in a manner constituting major action significantly affecting the quality of human environment must be accompanied by an EIS. *Andrus v. Sierra Club, supra* note 45, —— U.S. at ——, 99 S.Ct. at 2343–2344, 60 L.Ed.2d at 955; S.Rep.No.296, 91st Cong., 1st Sess. 20 (1969).

**48.** See note 45 *supra.* The President has recently taken steps to eliminate free or subsi-

dized parking for federal employees. See 15 Weekly Compilation of Presidential Documents 613 (Apr. 5, 1979). These actions are not yet effective, and even if they were, would not moot appellants' claim that an EIS should be prepared whenever space in federal parking facilities is leased to federal employees.

**49.** *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, supra* note 40, 435 U.S. at 551, 98 S.Ct. at 1215–1216, 55 L.Ed.2d at 484; *Scientists' Inst. for Public Information, Inc. v. Atomic Energy Comm'n, supra* note 39, 156 U.S.App.D.C. at 407–408, 481 F.2d at 1091–1093; *Environmental Defense Fund v. Corps of Engineers,* 492 F.2d 1123, 1131 (5th Cir. 1974); *Iowa Citizens for Environmental Quality v. Volpe,* 487 F.2d 849, 852 (8th Cir. 1973); *Trout Unlimited v. Morton,* 509 F.2d 1276, 1283, 1286 (9th Cir. 1974).

**50.** See text *supra* at notes 3–4.

**51.** The employees pay the parking management firm $11.25 per month for each parking space. GSA charges the agencies an additional $28.50 per month for each space used by their respective employees. Brief for Appellees at 25–26. Appellants do not contend that the $39.75 monthly total per space was less than the prevailing commercial rate. Brief for Appellants at 27.

**52.** Reply Brief for Appellants at 2.

**53.** See notes 21–24 and accompanying text *supra.*

ing court.[54] The deference owed an agency's construction of a statute it administers is heightened when, as in this case, the agency was actively involved in the drafting and adoption of the statutory language.[55]

■■■■ GSA's implementation of Section 490(j) means that each agency is required to pay GSA the prevailing commercial rate for space utilized by that agency's employees, and each employee is obligated

to pay the parking management firm a fee which reflects the cost of management and operation of his space.[56] Such an approach is a reasonable interpretation of Section 490(j), particularly in light of its legislative history, which reveals that the congressional purpose pervading passage of the Public Buildings Amendments of 1972 was to make government agencies accountable for the space they utilize and to prevent agencies from demanding space in excess of their needs.[57]

54. Interpretation of a statute by the agency charged with its execution should be given great deference by the courts. *E. I. du Pont de Nemours & Co. v. Collins*, 432 U.S. 46, 54–55, 97 S.Ct. 2229, 2234, 53 L.Ed.2d 100, 108 (1977); *Lewis v. Martin*, 397 U.S. 552, 559, 90 S.Ct. 1282, 1286, 25 L.Ed.2d 561, 567 (1970); *Zemel v. Rusk*, 381 U.S. 1, 11, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179, 187 (1965); *Forester v. Consumer Prod. Safety Comm'n*, 182 U.S.App.D.C. 153, 162, 559 F.2d 744, 783 (1977); *Haviland v. Butz*, 177 U.S.App.D.C. 22, 27, 543 F.2d 169, 174 (1976); *Lenkin v. District of Columbia*, 149 U.S.App.D.C. 129, 141, 461 F.2d 1215, 1227 (1972) and cases cited in notes 81–82 therein.

The Administrator of General Services has congressional authorization to maintain and operate governmental buildings, and to exact payment for the utilization of services and space by other federal agencies:

Whenever and to the extent that the Administrator has been or hereafter may be authorized by any provision of law other than this subsection to maintain, operate, and protect any building, property, or grounds situated in or outside the District of Columbia, including the construction, repair, preservation, demolition, furnishing, and equipment thereof, he is authorized in the discharge of the duties so conferred upon him . . .

to obtain payments, through advances or otherwise, for services, space, quarters, maintenance, repair, or other facilities furnished, on a reimbursable basis, to any other Federal agency . . . and to credit such payments to the applicable appropriation of the General Services Administration.

40 U.S.C. § 490(a) (1976).

55. *Zuber v. Allen*, 396 U.S. 168, 192, 90 S.Ct. 314, 327–328, 24 L.Ed.2d 345, 360 (1969); *United States v. American Trucking Ass'ns*, 310 U.S. 534, 547–549, 60 S.Ct. 1059, 1066–1067, 84 L.Ed. 1345, 1353–1354 (1940); *Certified Color Mfg. Ass'n v. Matthews*, 177 U.S.App.D.C. 137, 147, 543 F.2d 284, 294 (1976); *Patagonia Corp. v. Board of Governors of Fed. Reserve Sys.*, 517 F.2d 803, 812 (9th Cir. 1975).

GSA was actively involved in framing language for the Public Buildings Amendments of

1972. On August 4, 1971, GSA submitted to the Speaker of the House a draft of legislation proposing amendment of two statutes—the Public Buildings Act of 1959 and the Federal Property and Administrative Services Act of 1949—to

. . . require using agencies to budget and pay for the use of space and related services and to authorize the General Services Administration, subject to conventional Congressional and Executive controls, to finance its public buildings operations from the receipts arising therefrom.

Requiring all agencies to finance the cost of the space they occupy is consistent with the performance budgeting concept under which total program costs are reflected in the cost accounts of the program agency . . .

Section 4 would authorize the Administrator to establish such charges for the property management services provided other agencies. This would be accomplished by adding a new subsection (j)(1) to section 210 of the Property Act which concerns the operation of buildings and related activities.

H.R.Rep.No.989, 92d Cong., 2d Sess. 11–13 (1972); *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 2370, 2375.

56. See Affidavit of Jay Cohen, Transportation Specialist, General Services Administration, App. 41. The affidavit states that the $28.50 per month paid by the agency "is the Standard Level User Charge (SLUC) required by 40 U.S.C. § 490(j)." Affidavit of Jay Cohen, App. 41. We interpret this to mean that the agency pays the commercial rate for the space itself and the employee pays the additional cost of maintaining and operating the space.

57. The congressional purpose underlying passage of Section 490(j) of the Public Buildings Amendments of 1972 emanated from a concern that unless agencies are charged commercial rates for the space they use, their demands for space would exceed their actual needs. The House Report stated:

H.R. 10488, as reported, would require Government departments and agencies to

We find no merit in appellants' allegations that GSA, in leasing the Great Plaza area to a parking management firm, violated either NEPA or the Public Buildings Amendments of 1972. The judgment of the District Court is accordingly

*Affirmed.*

WILKEY, Circuit Judge:

I concur in the result.

pay user charges for the space they occupy in GSA-operated buildings. Such user charges would be deposited into the buildings fund. . . .

When the fund proposed in the bill is implemented, each agency would have to budget for its space needs, just as it now budgets for its personnel, travel, and other administrative costs. This would promote more efficient, more economical use of space by Government agencies. . . . Making agencies accountable for the space they use should result in more efficient space utilization by agencies.

H.R.Rep.No.989, 92d Cong., 2d Sess. 7–8 (1972), *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 2372–2373. Similar language was found in the Senate report:

Last, it is apparent to the committee that, at least in part, the government's current space problem may be attributed to a misallocation of existing office space among the Federal agencies. The G.S.A. presently bears the budgetary responsibility for the cost of the office space occupied by most of the Executive branch. Since the departments and agencies themselves are not assessed in their individual budgets for the value of the space which they occupy, they have little incentive to conserve. Instead, the tendency is for agencies to request from G.S.A. more space than they legitimately need, and then to hoard it. Aside from the fact that an accurate performance budget is defeated unless agencies are held accountable for all of their costs, the diseconomies of the present arrangement are clear.

S.Rep.No.412, 92d Cong., 1st Sess. 4 (1971).