UPPER SNAKE RIVER CHAPTER OF TROUT UNLIMITED, Idaho Environmental Council, South Fork Coalition, Idaho Sportsman Coalition, and Marv Hoyt, Plaintiffs,

v.

Donald HODEL, in his official capacity as Secretary of the Interior, C. Dale Duvall, in his official capacity as Chief of the Bureau of Reclamation, Defendants,

v.

COMMITTEE OF NINE, Twin Falls Canal Company, Northside Canal Company, Milner Irrigation District, Minidoka Irrigation District, Defendants/Intervenors, et al.

Civ. No. 88–4100.

United States District Court, D. Idaho.

Jan. 24, 1989.

John Radin, Radin & Webb, Idaho Falls, Idaho, for plaintiffs.

John A. Rosholt, Steven K. Tolman, Nelson Rosholt Robertson Tolman & Tucker, Twin Falls, Idaho, for Twin Falls Canal Co., North Side Canal Co., Milner Irrigation Dist., and Minidoka Irrigation Dist.

Kent W. Foster, Donald L. Harris, Holden Kidwell Hahn & Crapo, Idaho Falls, Idaho, for Committee of Nine, et al.

D. Marc Haws, Asst. U.S. Atty., John J. Hockberger, Jr., U.S. Dept. of Interior, Office of the Sol., Boise, Idaho, for U.S. defendants.

Roger D. Ling, Ling Nielsen & Robinson, Rupert, Idaho, for Aberdeen Springfield Canal Co., A & B Irrigation Dist. Co. and Falls Irrigation Dist.

## MEMORANDUM DECISION

CALLISTER, District Judge.

The Court conducted hearings on November 8 and 9, 1988, on plaintiffs' motion for preliminary injunction. At the conclusion of the hearing counsel for all parties stipulated that the Court may consider the case as having been fully submitted on the merits, and that the evidence produced at the hearing, together with the affidavits and pleadings filed by the parties, may be considered by the Court to resolve the entire case without the need for further hearing. The parties have now submitted their final briefing and the matter is ready to be resolved. This written memorandum decision shall constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

## FINDINGS OF FACT

The subject of this lawsuit centers around the water, or lack thereof, flowing in the South Fork of the Snake River below the Palisades Dam. The plaintiffs, primarily sportsmen, filed suit against the Bureau of Reclamation (BOR) claiming that the BOR is required to complete an Environmental Impact Statement (EIS) in compliance with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4331 *et seq.*, before reducing the flow below Palisades Dam to 1,000 cubic feet per second (cfs) or lower. In addition to the initially named defendants, the Court has allowed a number of defendants to intervene, those being canal companies and irrigation districts.

The Palisades Dam and Reservoir which began operating in 1957 constitutes a portion of the BOR's Minidoka Project which is a series of dams and reservoirs throughout much of South East and South Central Idaho. The Palisades Dam and Reservoir provides for storage and regulation of water for irrigation, flood control, power production, fish and wildlife, and recreation. Approximately 1,173,000 acres receive all or part of its water source from the Minidoka System. The storage capacity of Palisades is 1,200,000 acre feet while the storage capacity of the entire Minidoka Project is 4,151,490 acre feet. *See* Defendants' Exhibit 9.

In years when the precipitation is average or above, there is no cause for alarm. However, because of the unusually dry past, flows released from Palisades Dam were reduced to approximately 750 cfs during the winter months of 1987–1988. As of October 1988, the Palisades Reservoir contained only 200,000 acre feet of water, an unprecedented low due to the two consecutive years of drought conditions. The entire Minidoka System is desperately in need of large quantities of water. On October 26, 1988, the entire system was 89% depleted with only ¼ of the normal supply available. The inadequate amount of water storage and bleak future outlook were in part why the BOR reduced the flows below Palisades to 750 cfs on November 4, 1988. Prior to reducing the flow to 750 cfs, the BOR had consulted with the Idaho Department of Fish and Game.

The South Fork of the Snake River, a "blue ribbon trout stream," lures fisher-

men from all over the world to come experience the thrill of catching a cutthroat or brown trout. These trophy fish have continued to thrive even though there has been a number of recorded incidents in which the flows below Palisades Dam were less than 1,000 cfs since the Dam was built in 1957.

The BOR has entered into contracts with various individuals and entities for the storage of water in Palisades Reservoir for delivery during the irrigation season. Certain contract spaceholders have a winter water savings clause in their contracts. This clause is an agreement by the spaceholders to forego diversions of water from the Snake River during the period from November 1 through April 30. These spaceholders who forego their use of water are then given a priority interest in the water stored in Palisades Reservoir. *See, e.g.,* Defendants' Exhibit 10.

In 1950, the BOR reported to Congress in a supplemental report concerning the future operation of Palisades Dam and Reservoir which became part of the authorizing legislation that the anticipated stream flow below the reservoir would be "an average daily flow of 1,000 second feet and a minimum of approximately 500 second feet would be provided below the dam as compared with the present minimum flow of 1,700 second feet." *See* Defendants' Exhibit 7, p. 37, section 18.

It is without controversy that reducing the stream flows below 1,000 cfs will have a negative impact on the downstream fishery. However, controversy does arise as to the extent of that injury. The Court recognizes that the fishery's injury to a large extent will be upon the juvenile classes.[1] However, the Court is not persuaded to adopt the extent of injury alluded to by the plaintiffs and their expert, Mr. Steve Elle. Furthermore, past reductions in the flow below 1,000 cfs demonstrates that the "blue ribbon fishery" can rejuvenate in time. Even the plaintiffs' expert Mr.

Elle, testified that the fishery could revive in three to five years.

It is likely that the reduced flows below Palisades Dam will have an adverse effect on the quality of the fishery and an economic impact on area outfitters and guides as well as others involved in the tourism industry. However, that economic effect is slight when compared to the potential loss which would result from the failure to store water required for irrigation of crops in the Minidoka Project. The estimated losses which could occur by increasing the outflow start at $235 million and could easily continue upwards. *See* Defendants' Exhibits 16 and 17.

## CONCLUSIONS OF LAW

◼ The Court issued an order denying plaintiffs' request for preliminary injunction on November 18, 1988. This memorandum decision sets out in detail the Court's written findings on that preliminary injunction as well as the case on the merits.

The parties to this cause of action agree that the specific issues before this Court are ones of first impression. Such groundbreaking compels the Court to communicate its reasoning with more precision and understanding.

The standard for obtaining a preliminary injunction in the Ninth Circuit was set forth recently in *United States v. Odessa Union Warehouse Co-op,* 833 F.2d 172 (9th Cir.1987). There, the court found that the traditional factors considered in determining whether or not to grant a preliminary injunction are: (1) the likelihood of plaintiff's success on the merits; (2) the possibility of plaintiff suffering irreparable injury if the relief is not granted; (3) the extent to which the balance of hardships favor the respective parties; and (4) in certain cases whether the public interest will be advanced by the provision of preliminary relief. *Id.* at 174.

---

**1.** When water levels are reduced the side channels on the river develop into pockets of water which become separated from the main stream. If the fish are in these pockets when the water is reduced, they become trapped. More juvenile fish rather than adults are lost because the juveniles seek the shallow waters and covered areas as protection from predators.

In order to obtain a preliminary injunction, the moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardship tips sharply in the moving party's favor. *Chalk v. United States Dist. Court, Cent. Dist. of California,* 840 F.2d 701, 704 (9th Cir.1988); *Odessa Union Warehouse Coop,* 833 F.2d at 174. These two tests are not separate but they are the outer reaches of a single continuum. *City of Tenakee Springs v. Block,* 778 F.2d 1402, 1407 (9th Cir.1985). Under either of these tests, the plaintiffs have failed to demonstrate their right to a preliminary injunction. If precipitation in 1989 is average or below and the defendants were ordered to increase the outflow at Palisades Dam, then literally hundreds of millions of dollars in damages could occur. On the other hand, by refusing to grant the injunction, the Court is recognizing that many native cutthroat may die with the largest impact on the juvenile fish. However, even the plaintiffs' expert witness from the Idaho Department of Fish and Game testified that the South Fork fishery could rehabilitate itself in a matter of three to five years. Additionally, he testified that stocking programs could be implemented at a cost far less than the possible loss to the farming economy. Any way it is looked at, the balance of hardships weighs heavily in favor of the defendants. Moreover, plaintiffs have failed to show they would suffer irreparable injury if the injunction was not issued.

The Court will now address the merits of plaintiffs' complaint and in so doing will demonstrate that the preliminary injunction was properly denied.

■ Plaintiffs maintain that reducing flows below 1,000 cfs invokes NEPA, which in turn requires the completion of an EIS in accordance with 42 U.S.C. § 4332. That section provides in part:

[A]ll agencies of the federal government shall—

(C) include in every recommendation or report on proposals for legislation and other major federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) relationship between local short-term uses of man's environment and the maintenance of enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in a proposed action should it be implemented.

In support of their position that the BOR must prepare an EIS for the Palisades Dam, plaintiffs rely on a number of cases. These cases deal with proposed dam projects, channelization, and various deposits in rivers. Although the cited cases are beneficial, they are significantly distinguishable from the case before the Court. Specifically, a majority of the cases entail proposed federal action such as channelization, new industrial water marketing programs, hydroelectric dams, or dredging. Although these cases do have similarities, the major distinguishing factor is that most of the actions are proposed and not ongoing or continuing federal action. The Court sees this as a significant factor in discounting plaintiffs' authority. The Court is also reminded of the Ninth Circuit's finding that "one of NEPA's goals is to facilitate 'widespread discussion and consideration of the environmental risks and remedies associated with the *pending project....*'" See *LaFlamme v. F.E.R.C.,* 852 F.2d 389, 398 (9th Cir.1988) (emphasis added), *citing Warm Springs Dam Task Force v. Gribble,* 621 F.2d 1017, 1021 (9th Cir.1980) (*per curiam*). The court in *LaFlamme* continued on to find that NEPA requires the evaluation take place *before* a project is approved. *LaFlamme,* 852 F.2d at 398.

■ The Court agrees with the plaintiffs that the BOR, a federal agency, is charged with operating and maintaining

Palisades Dam. Nevertheless, the Court disagrees with plaintiffs and finds that the reduction of flows in the South Fork does fall within the so-called "continuing operation doctrine" and that such reductions are "routine" or "ministerial" actions. There is no question that the BOR is not engaging in any action which it has not already taken in the past. As mentioned earlier, there have been numerous occasions where the output of water below the dam has fallen below 750 cfs. These occasions typically occur in heavy drought years. The Ninth Circuit has provided that an EIS is not required when a proposed federal action will effect no change in the status quo. *Burbank Anti–Noise Groups v. Goldschmidt*, 623 F.2d 115, 116 (9th Cir.1980) *citing Committee for Auto Responsibility v. Solomon*, 603 F.2d 992, 1001–03 (D.C. Cir.1979). In *Burbank*, an anti-noise group sought to require the preparation of an EIS for an existing airport to be purchased with the aid of federal financial assistance. In refusing to adopt this requirement, the court relied heavily upon the fact that the airport was already existing and not a mere proposal. This Court agrees with the court in *Committee for Auto Responsibility*, in that "[T]o compel [the agency] to formulate an EIS under these circumstances would trivialize NEPA's EIS requirement and diminish its utility in providing useful environmental analysis for major federal actions that truly affect the environment." *Committee for Auto Responsibility*, 603 F.2d at 1003. In the case of the Palisades Dam, the fluctuating flows are routine actions which are contingent upon Mother Nature for snowpack, runoff, precipitation, and carryover. As part of its routine and ongoing operations, the BOR fluctuates the flows depending upon weather conditions past and future. Overall, the Court views the fluctuation of flows below Palisades as "ongoing operations" which do not have to comply with the EIS provisions of NEPA.

Plaintiffs also advance an argument that the BOR has not complied with its own standard operating procedures that a flow of 1,000 cfs below the Palisades Dam is considered minimum. *See* Plaintiffs' Exhibit 5, *Standard Operating Procedures for Palisades Dam and Reservoir*, February 10, 1988, p. 37. These standard operating procedures were not implemented as a rigid barrier, but were enacted for guiding the BOR in its operation of the dam. These standard operating procedures are not binding in that they cannot require the agency to do something which it is physically incapable of doing. For instance, if the agency were to increase the amount of flow and the severe drought condition continued, then at some point there would be no water left in the Palisades Reservoir. This, in and of itself, would physically prevent the BOR from complying with the 1,000 cfs minimum stream flow. The bottom line is that the BOR's hands are tied by Mother Nature and the BOR must operate the dam and reservoir as the circumstances dictate.[2]

After consideration of the preceding, it is clear that the plaintiffs were not entitled to a preliminary injunction as they could show no irreparable injury, and the hardships tipped sharply in favor of the defendants. Moreover, after full consideration of the case on the merits, the Court finds that the BOR is not required to prepare an EIS for the continued operation of the Palisades Dam and Reservoir.

As alluded to earlier, the United States Government, through the BOR, is contractually obligated to store water in the Palisades Reservoir for contract holders. Requiring the BOR to prepare an EIS would undoubtedly interfere with these contractual obligations. The Court has not been supplied and is unable to find any authority that would justify such actions.

The Idaho legislature foresaw future problems associated with supplying mini-

2. At the hearing the Court granted the defendants/intervenors' motion to limit testimony concerning bald eagles and peregrine falcons. Although the Court refused the testimony, it allowed the plaintiffs to offer proof as to the proposed witnesses' testimony. After reviewing the offer of proof, the Court is convinced that even if it had considered the testimony concerning the bald eagles and the peregrine falcons that such would not have affected its final judgment in this matter.

mum stream flows for the protection of the fish and wildlife habitat. In order to address these issues, the legislature enacted minimum stream flow legislation. *See* Idaho Code § 42–1501 to § 42–1505. The legislation sets forth procedures to apply for minimum stream flows with the Idaho Water Resource Board. In short, there is state legislation that would effectuate what the plaintiffs are trying to do by bringing this lawsuit. The plaintiffs are not without a remedy as they may apply for a minimum stream flow under Idaho law.

The plaintiffs also introduced evidence that large quantities of water are being wasted. To the contrary, defendants produced an hydrologist who testified that much of the water the plaintiffs termed as waste percolated into the ground and recharged the Snake River Aquifer System. Even though this Court agrees with the defendants that no large quantities of waste are occurring once the entire Snake River System is considered, this issue would best be addressed in the state court system.

If the Court were to accept the plaintiffs' position that an EIS is needed before the BOR could reduce the flow below the Palisades Dam to less than 1,000 cfs, the effect could be disasterous for the farmers as well as the sportsmen. So far the snowpack for the 1988–1989 winter looks favorable. However, if the next few months are extremely dry, an increase in the outflow of the Palisades Dam could possibly completely drain the reservoir before an EIS could be completed. Such would entirely destroy the fishery.

This Court feels that an EIS would be helpful to the BOR. However, it is in no way required. Further studies and conservation measures would also be beneficial to the Snake River fishery. Nevertheless, there is a major distinction between requiring them to be conducted and agreeing that they would be beneficial. In sum, this Court believes that future studies of conservation methods would greatly benefit the Snake River fishery as well as other rivers. But it is not persuaded to and the case law does not require it to order the BOR to prepare an EIS before reducing the flows below the Palisades Dam to 1,000 cfs or lower.

After consideration of the above-entitled case on its merits, the Court is of the opinion that the plaintiffs should take nothing by reason of their complaint against the defendants and defendants/intervenors.

ORDER

The Court has examined the entire record in the above-entitled matter. In accordance with the views expressed in the findings of fact and conclusions of law accompanying this order pursuant to Fed. R.Civ.P. 52(a),

NOW, THEREFORE, IT IS HEREBY ORDERED that defendants' motion to dismiss due to mootness be, and the same is hereby, DENIED.

IT IS FURTHER ORDERED that plaintiffs' motions for preliminary and permanent injunctions be, and the same are hereby, DENIED.

IT IS FURTHER ORDERED that plaintiffs take nothing by reason of their complaint against the defendants and defendants/intervenors.