The **TAUBMAN REALTY GROUP LIMITED PARTNERSHIP**, et al., Plaintiffs

v.

Norman Y. **MINETA**, et al., Defendants.

No. CIV.A. 3:02CV2.

United States District Court, E.D. Virginia, Richmond Division.

May 3, 2002.

Karen T. McWilliams, Esquire, Verner, Lipfert, Bernhard, McPherson & Hand, Gordon S. Woodward, Jr., Esquire, Neil T. Proto, Esquire, Schnader, Harrison, Segal & Lewis, LLP, Washington, DC, for Plaintiffs.

Steven E. Gordon, Esquire, Richard Parker, Esquire, United States Attorney's Office, Alexandria, VA, for Mineta and Fed'l Highway.

Robert D. Perrow, Esquire, Williams, Mullen, Clark & Dobbins, PC, Richmond, VA, Karen A. Doner, Esquire, Williams, Mullen, Clark & Dobbins, PC, Washington, DC, for Henrico Co.

## MEMORANDUM OPINION

PAYNE, District Judge.

This action arises out of the decision by the County of Henrico, Virginia (the "County") to approve a private developer's preliminary plans to construct a regional shopping center in the County and near the intersection of Interstate Highways 64 ("I-64") and 295 ("I-295"). The Plaintiffs, the Taubman Realty Group, Limited Partnership ("Taubman") and TRG–Regency Square Associates, LLC ("TRG"), are competing shopping center developers. Taubman and TRG instituted this action for declaratory and injunctive relief against Norman Y. Mineta, the United States Secretary of Transportation, and the Federal Highway Administration (collectively the "Federal Defendants") and against the County.[1] The claims against the Federal Defendants allege violations of both the

---

1. This action originally was filed in the United States District Court for the District of Columbia. Upon motion of the County, and by Consent Order entered December 21, 2001, that Court transferred the case to this Court. For reasons neither expressed nor readily apparent, however, this Court did not receive the case file and accompanying transfer documents until several weeks after entry of the transfer order.

Federal–Aid Highway Act ("FAHA")[2] and its implementing regulations, and the National Environmental Policy Act ("NEPA")[3] and its implementing regulations. The claim against the County alleges a violation of the Supremacy Clause of the United States Constitution.[4] The County has filed a Motion to Dismiss the action as to it under both Fed.R.Civ.P. 12(b)(1), arguing that the Court does not have subject matter jurisdiction on account of the Plaintiffs' lack of standing, and Fed. R.Civ.P. 12(b)(6), arguing that the plaintiffs have failed to state claims on which relief can be granted. The Federal Defendants have filed a Motion to Dismiss on the same grounds. Alternatively, the Federal Defendants have moved for summary judgment under Fed.R.Civ.P. 56.[5] For the reasons set forth below, Taubman and TRG lack standing to pursue their claims against the Federal Defendants, and they have failed to state a cognizable claim under the Supremacy Clause against the County. Accordingly, both of the motions to dismiss are granted and the action is dismissed without prejudice.

## STATEMENT OF FACTS

Taubman is a Delaware limited partnership with its principal place of business in Michigan. Taubman is the majority owner of TRG, which is a Virginia limited liability corporation and which owns Regency Square Mall ("Regency" or "the Regency mall"), a regional shopping center located in the County. Regency is located approximately five miles from the site on which the County has approved a private developer's plans to build another regional shopping center known as the Short Pump Town Center. Taubman also is building another large shopping center about five miles south of Regency. Both that new shopping center and Regency would be in direct competition with the Short Pump Town Center.

The Short Pump Town Center is to be constructed on a large tract of undeveloped land that fronts on U.S. Highway 250 (also known as "West Broad Street") and that is near the intersection of I–64 and I–295, a circumferential highway around the Richmond metropolitan area. When built, the Short Pump Town Center (including the mall and out parcels) will house approximately 1.4 million square feet of retail space. Regency and the proposed Short Pump Town Center are "within the same federal Air Quality Control Region, and are served by the same MPO [Metropolitan Planning Organization] under 23 U.S.C. § 134, the Richmond Regional Planning District Commission."[6] (Com-

2. 23 U.S.C. §§ 101, *et seq.*

3. 43 U.S.C. §§ 4321, *et seq.*

4. U.S. Const., Art. VI, cl. 2.

5. It is becoming common for defendants to file a single pleading in which dismissal is sought alternatively under Rules 12(b)(6) and 56. Unfortunately, most motions of that ilk, such as the one filed by the Federal Defendants in this case, fail to appreciate that dismissal under Rules 12(6)(6) and 56 are examined according to entirely different legal tests, are animated by significantly different controlling precepts, and are analyzed by using considerably different jurisprudential modes. The memorandum filed by the Federal Defendants seems to reflect awareness of, at least, some of these differences, but it does not apply them to its analysis. As a general proposition, defendants would be better served by eschewing the practice of pleading for dismissal in the alternative. If litigants truly believe that, early on, alternative grounds exist for disposition under Rules 12(b)(6) and 56, they would be well advised to file separate motions with separate supporting briefs in which the appropriate principles separately are applied. Thereupon, most would likely realize that the filing of at least one of the motions ought to be foresworn.

6. 23 U.S.C. § 134, entitled "Metropolitan planning", sets forth provisions to facilitate, and to govern, cooperation between federal, state, and local officials with respect to "the

plaint, ¶ 14). The First Amended Complaint (the "Amended Complaint") alleges that "Regency employs approximately 2,000 people (depending on the season) . . . many of whom use I–64 and West Broad Street to travel to work." (Complaint, ¶ 15).[7] It also is alleged that "approximately 8 million people a year patronize Regency Square Mall, many of whom reside in the vicinity of the proposed Short Pump mall or who otherwise require access to Regency via I–64 and West Broad Street." (Complaint, ¶ 15). Presumably, the 8 million figure includes customers who visit Regency on more than one occasion because there are not 8 million people in the Commonwealth of Virginia,[8] much less in the Richmond metropolitan area. Moreover, because Richmond is located in the middle of the state, it is doubtful that out-of-state shoppers comprise a substantial percentage of Regency's customer base.

On December 15, 1998, and pursuant to Va.Code § 15.2–2240 [9] and Chapter 24, section 24–106 of the Henrico County Code, the Henrico County Planning Commission (the "Commission") granted the developer's request for approval of a Plan of Development ("POD") for the Short Pump Town Center.[10] (Complaint, ¶ 20). As originally conceived, the Short Pump Town Center was to consist of over 928,000 square feet (including two anchor stores) developed on 147 acres of undeveloped land in the western portion of the County. (Complaint, ¶ 20). However, the developer apparently chose not to proceed with the project as originally proposed, and, instead, on July 14, 2000, it submitted a petition to the Henrico County Board of Supervisors (the "Board") seeking the creation of a Community Development Authority ("CDA") for the purpose of financing (in part through the use of public funds) a much larger shopping center. On September 26, 2000, the Board approved that petition. (Complaint, ¶ 22). On October 24, 2000, the Board passed an ordinance authorizing the County to enter into several agreements with the developer; these agreements governed a procedure whereby the County would grant a $30 million subsidy to the developer for use in the Short Pump Town Center project.[11] (Complaint, ¶ 23).

---

safe and efficient management, operation, and development of surface transportation systems that will serve the mobility needs of people and freight and foster economic growth and development within and through urbanized areas, while minimizing transportation-related fuel consumption and air pollution." Under 23 U.S.C. § 134(b), state and local officials are charged with designating "metropolitan planning organization[s] [or, "MPOs"] . . . for each urbanized area with a population of more than 50,000 individuals[.]"

7. It would be more accurate to say that, depending on the season, some 2,000 people are employed *at* (but not necessarily *by* ) Regency. Most of those people are employed by the numerous retailers who operate facilities in the shopping center. However, it is likely that TRG, as well as its maintenance and security contractors, do have a few employees located at Regency.

8. The most recent statistics released by the United States Census Bureau estimate that 7,187,734 people live in the Commonwealth of Virginia. *See* States Ranked by Estimated July 1, 2001 Population, *available at* http://www.eire.census.gov/popest/data/states/tables/ST–EST2001–04.php.

9. Va.Code § 15.2–2240 mandates that "[t]he governing body of every locality shall adopt an ordinance to assure the orderly subdivision of land and its development."

10. Under Virginia law, the purpose of a POD is to assure that a proposed project complies with regulations contained in applicable zoning ordinances. *See* Va.Code § 15.2–2286(A)(8).

11. On February 13, 2001, that funding mechanism was invalidated by the Henrico County Circuit Court. Subsequently, on November 2, 2002, the Supreme Court of Virginia vacated

On January 11, 2001, the developer submitted to the Commission a request to revise the December 15 POD for the purpose of, among other things, expanding the size of the project by over forty percent, thereby contemplating that the Short Pump Town Center would consist of approximately 1,250,000 square feet (including four anchor stores) in the mall, as well as out parcels consisting of an additional approximately 200,000 square feet. (Complaint, ¶ 24).

Plaintiffs allege that, according to the developer's own predictions, "the Short Pump Town Center will generate approximately 37,000 to 44,000 new motor vehicle trips per day [and create] serious traffic congestion problems ... including the failure of *every* intersection on West Broad Street east of the proposed project, as well as key elements of the I–64/West Broad Street interchange." [12] (Complaint, ¶¶ 25–26). Neither of the two traffic studies that were prepared for the developer recommended or suggested road improvements to alleviate these anticipated traffic problems. To the contrary, the first study concluded that the sort of improvements that would be necessary to allow even one of the relevant intersections to function at even "minimal levels of service ... are not thought to be economically practical at this time." The second study concluded that, despite the anticipated traffic problems, "the peak-hour conditions ... are considered tolerable for a major mixed-use area." (Complaint, ¶ 27). Plaintiffs allege that the Henrico County Department of Public Works ("DPW") also examined the anticipated traffic failures associated with con-

struction and use of the Short Pump Town Center. DPW acknowledged that significant traffic failures would be expected but, nevertheless, "recommended no roadway improvements other than directly proximate to the site and related to the ingress and egress of vehicles from the shopping center." (Complaint, ¶¶ 28–29).

Indeed, on April 24, 2001, the Virginia Department of Transportation ("VDOT") formally notified the County that it could not recommend development of the Short Pump Town Center because of a "grave concern" about the anticipated traffic problems associated therewith. VDOT emphasized that additional traffic would be expected as a result of building and operating the project and that this traffic would result in the "failure of all signalized intersections on [West Broad Street] and [the] failure of the weave and merge maneuvers at the interchange on I–64." Despite VDOT's reaction, however, the Commission approved the revised POD on April 25, 2001. (Complaint, ¶¶ 33–34).

Moreover, the Amended Complaint alleges that the County "intended the traffic failures to force the construction of an additional interchange on I–64 at the proposed extension of Gayton Road to alleviate the traffic problems." (Complaint, ¶ 30). Gayton Road runs north-south and, at a point just southwest of the proposed site of the Short Pump Town Center, it intersects with West Broad Street (which is the major existing thoroughfare running east-west and just south of that proposed site). It is the plaintiffs' specific contention that construction and operation of the Short Pump Town Center will require an additional point of access to I–64, which

---

the Circuit Court's decision and dismissed that case. *See Short Pump Town Center Community Development Authority v. Hahn, et al.,* 262 Va. 733, 554 S.E.2d 441 (Va.2001). The trial of a related case involving that funding

mechanism now is underway in the Circuit Court.

**12.** Broad Street (Virginia Route 250) is a major east-west road serving the greater Richmond metropolitan area. *See infra.*

runs east-west and just north of the proposed site of the Short Pump Town Center. They assert that the only viable means of accomplishing this would be to extend Gayton Road northward until it intersected with I-64 and to build a point of access at that intersection.[13]

Plaintiffs aver the following facts in support of this final argument: (1) DPW stated that such a new interchange would "greatly improve the traffic in the West Broad Street Corridor[;]" (2) in describing the non-revenue benefits associated with the Short Pump Town Center project, the developer posited that the project "would [p]rovide additional justification for another access to I-64 at Gayton Road extended[;]" and (3) the County Manager testified during the Virginia Circuit Court proceedings that an I-64 interchange at Gayton Road would solve the anticipated traffic-related problems associated with the Short Pump Town Center project. The plaintiffs allege that "neither [the County] nor the developer undertook any study of the feasibility, safety, or environmental impact of this proposed interchange, nor did they coordinate with the MPO, VDOT, or FHWA in the planning of this new access to I-64." (Complaint, ¶¶ 30-34).

On February 6, 2001, TRG sent to Roberto Fonseca-Martinez (who is the Administrator of the Virginia Division of FHWA) a letter in which it notified FHWA of the County's plans to construct the Short Pump Town Center and the anticipated traffic-related considerations incident thereto. TRG requested that FHWA "take action in furtherance of its statutory duties under FAHA and NEPA." Specifically, TRG requested that FHWA intervene in a Commission hearing that was scheduled for February 28, 2001 and during which the revised POD for the Short Pump Town Center was to be discussed. (Complaint, ¶ 31).

On April 11, 2001, Emily Lawton (who is an FHWA Area Engineer) responded in a letter sent on behalf of Fonseca-Martinez that FHWA was "not in a position to take any direct action" with respect to TRG's expressed concerns about the Short Pump Town Center. The letter explains that "[u]nder the Federal-aid highway program ... clear roles have been established. [FHWA] is responsible for making Federal-aid highway funding available to state transportation departments; ensuring compliance with Federal laws; and providing technical assistance. The states are responsible for selecting, planning, designing, and contracting for the construction of Federal-aid highway projects, and for maintaining and operating those projects."[14]

Lawton's letter continues by noting that Broad Street is not on the National Highway System and that, pursuant to 23 C.F.R. § 625.3(2), "the facility is to be designed, constructed, and maintained in accordance with state laws ...."[15] More-

13. The plaintiffs also posit "modifications and improvements to the I-64/West Broad Street interchange[]" as a potential change in access to I-64. (Complaint, ¶ 85). In their briefs, and at oral argument, however, plaintiffs focused their attention on the "extended Gayton Road" alternative.

14. The plaintiffs cited to only some portions of the April 11, 2001 letter in the Complaint. The other portions cited above are taken directly from the letter itself, which the Federal Defendants appended to their Motion to Dis-

miss. Reliance upon documents alleged or referenced to in a complaint (the authenticity of which are not disputed) properly may be considered, and relied upon, in deciding a motion to dismiss pursuant to Fed.R.Civ.P. 12. *See e.g., Beddall v. State Street Bank & Trust, Co.,* 137 F.3d 12, 17 (1st Cir.1998) (citing authorities).

15. 23 C.F.R. § 625.3(2) explains that "[f]ederal-aid projects not on the NHS are to be designed, constructed, operated, and maintained in accordance with State laws, regula-

over, the letter explains that it was FHWA's understanding that, despite the fact that both VDOT and DPW acknowledged that "the planned development will have an impact on traffic[,]" "VDOT does not believe they have statutory authority to block the action of the county planning commission." The letter also notes that "VDOT has requested additional traffic impact studies" and states that FHWA "will be involved in the review of this information with regard to any impacts to [I–64]." Finally, with specific reference to "a new interchange at the planned extension of Gayton Road and [I–64][,]" the letter explains that FHWA had concluded that such an additional interchange "would [be] difficult to justify." (Complaint, ¶¶ 31–32). As noted above, and on April 24, 2001, VDOT (which had conducted additional traffic studies) advised that it had grave concerns about the traffic problems expected to be generated by the new mall and, therefore, could not recommend development thereof.

It is undisputed that neither the Richmond MPO's transportation improvement program, which the Federal Defendants describe as a "short-term planning device", nor its long-range transportation plan, contemplates a modification of access at the West Broad Street/I–64 interchange. Although the long-range plan does contemplate a new point of access to I–64 at the extended Gayton Road, VDOT has not requested FHWA's approval for such a project.

In essence, the plaintiffs complain that, even before FHWA has been presented with a proposal for a change in access to a highway on the Federal Highway System ("FHS"), FHWA nevertheless is obligated to take some sort of action with respect to the Short Pump Town Center to prevent the (undisputed) traffic problems that are expected to arise therefrom. Specifically, the plaintiffs present three claims for relief: (1) that the Federal Defendants unlawfully have delegated to the County their authority under the FAHA and applicable regulations to "approve access changes on I–64" and that, in doing so, they have unlawfully withheld agency action and failed to act in a manner that is required by law[;] [16] (2) that the Federal Defendants unlawfully have withheld agency action by their failure "to apply the requirements of NEPA to the Short Pump Town Center proposal[;]" [17] and (3) that, "regardless of [FHWA's] discretion to approve or deny them," the County's actions, "taken pursuant to local law[,] conflicts with the authority of the [Federal] [D]efendants and is contrary to 23 U.S.C. § 111." [18] Plaintiffs rely upon the judicial review provisions of the Administrative Procedure Act ("APA") in order to assert the first two claims (the "Statutory claims") above.[19] As noted above, the substantive basis underlying the third claim is the Supremacy Clause of the United States Constitution.

Plaintiffs' prayer for relief includes the following requests: (1) a declaration that

---

tions, directives, safety standards, design standards, and construction standards."

**16.** Complaint, ¶¶ 61–72.

**17.** Complaint, ¶¶ 73–80.

**18.** Complaint, ¶¶ 81–86.

**19.** The judicial review provisions of the APA, 5 U.S.C. §§ 702–706 grant to the federal courts jurisdiction to review "[a]gency action

made reviewable by statute" and "final agency action for which there is no other adequate remedy in a court ...." 5 U.S.C. § 704. Agency "action", in this context, includes agency action that is "unlawfully withheld or unreasonably delayed" or taken "without observance of procedure required by law." 5 U.S.C. § 706.

the Federal Defendants' acts and omissions violate FAHA and NEPA; (2) a declaration that approval of the POD for the Short Pump Town Center violates the Supremacy Clause of the United States Constitution; (3) permanent injunctive relief: (a) requiring the defendants to comply with the applicable statutes and regulations; (b) requiring FHWA to comply with FAHA and to direct the County to prepare an EIS respecting the anticipated access changes to I–64 that the Short Pump Town Center project will require; and (c) enjoining FHWA from making further grants of money to VDOT (for use by the County) until the County complies with the foregoing; (4) attorneys' fees and expenses; and (5) other relief such as the Court deems appropriate.

On March 15, 2002, the Court convened the parties for a hearing respecting .the County's pending Motion to Dismiss and the Federal Defendants' Motion to Dismiss or in the Alternative For Summary Judgment. At the conclusion of that hearing, and orally from the bench, the parties were told that the action would be dismissed for reasons to be set forth in a memorandum opinion.

## DISCUSSION

### A. Applicable Statutory Provisions

Before assessing the three counts of the Amended Complaint, it is appropriate briefly to review the federal statutes upon which the plaintiffs' rely.

### 1. The Federal–Aid Highway Act

The Federal–Aid Highway Act, 23 U.S.C. §§ 101, *et seq.*, and its implementing regulations create an elaborate scheme of cooperation between federal, state, and local authorities respecting the planning, construction, maintenance, and funding of federal-aid highways. The essence of this complex system is that, pursuant to FAHA, FHWA reimburses the states for some of the costs incurred in completing highway projects. *See e.g.*, 23 U.S.C. §§ 105; 120; 23 C.F.R. §§ 140.203; 140.205; 140.703. States must comply with applicable federal laws, regulations, and procedures in order to be eligible for federal reimbursement. *See e.g.*, 23 C.F.R. §§ 1.9; 1.36.

Congress often attaches conditions to such reimbursements (which essentially are federal grants) in order to ensure, for example, that highway projects are carried out in accordance with federal safety standards and in a non-discriminatory manner. Nevertheless, FAHA makes clear that "[t]he authorization of the appropriation of federal funds or their availability for expenditure ... shall in no way infringe on the sovereign rights of the States to determine which projects shall be federally financed." 23 U.S.C. § 145(a). In addition, Congress emphasized in FAHA that "[t]he construction of any highway or portions of highways located on a Federal-aid system shall be undertaken by the respective state transportation department or under their direct supervision.... The construction work and labor in each State shall be performed under the direct supervision of the State transportation department and in accordance with the laws of that State and applicable federal laws." 23 U.S.C. § 114(a).

One provision of FAHA that is particularly relevant to the present dispute is 23 U.S.C. § 111(a). That provision requires that, as a condition of federal funding for any and all state highway projects on the FHS, the "agreement[ ] ... shall contain a clause providing that the State will not add any points of access to, or exit from, the project in addition to those approved by the Secretary [of Transportation] in the plans for such project, without the prior approval of the Secretary."

In addition, 23 C.F.R. § 625.3 mandates that "[d]esign and construction standards for new construction ... of a highway on the [National Highway System, or "NHS"] (other than a highway also on the Interstate system or other freeway) shall be those approved by the Secretary in cooperation with the State highway departments." These standards may take into account a number of environmental and aesthetic factors. 23 C.F.R. § 625.3(a)(1). In contrast, "[f]ederal-aid projects not on the NHS are to be designed, constructed, operated, and maintained in accordance with State laws, regulations, directives, safety standards, design standards, and construction standards." 23 C.F.R. § 625.3(a)(2).

FAHA also requires regional MPOs to consider a wide range of factors related to safety, efficiency, energy conservation, and the environment when they undertake their statutorily prescribed planning missions. *See* 23 U.S.C. § 134. These factors influence the long and short-term transportation plans and improvement programs that MPOs must generate and update periodically. MPOs must afford an opportunity for public comment on such plans and programs before they are adopted. *See* 23 U.S.C. §§ 134(g) and (h). Finally, FAHA places ongoing obligations upon the states, which delegate such duties to their respective departments of transportation (such as VDOT in this case), with respect to planning and developing transportation programs. *See* 23 U.S.C. § 135. The overall scheme of planning and coordination is quite intricate.

## 2. The National Environmental Policy Act

The duties that NEPA, 42 U.S.C. §§ 4321, *et seq.*, imposes upon federal agencies essentially are procedural in nature. *See e.g., Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). A fundamental feature of NEPA is its requirement that federal agencies prepare "a detailed statement by the responsible official" for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This report is known as an environmental impact statement ("EIS"). An EIS must consider the following issues: (i) the environmental impact of the proposed action; (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented; (iii) alternatives to the proposed action; (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. *Id.* NEPA requires a balancing of environmental costs and economic and technical benefits. It does not require federal agencies to elevate environmental concerns over other appropriate considerations, nor does it mandate any particular conclusions.

As NEPA makes clear, the requirement for preparation of an EIS is triggered upon a "proposal[ ] for legislation and other major Federal actions ...." The Supreme Court of the United States has emphasized that "the moment at which an agency must have a final statement ready 'is the time at which it makes a recommendation or report on a *proposal* for federal action.'" *Kleppe v. Sierra Club,* 427 U.S. 390, 406, 96 S.Ct. 2718, 2728, 49 L.Ed.2d 576 (1976) (*quoting Aberdeen & Rockfish R.R. Co. v. SCRAP,* 422 U.S. 289, 320, 95 S.Ct. 2336, 2356, 45 L.Ed.2d 191 (1975) (emphasis in original)). There has been a great deal of litigation, however, respect-

ing what constitutes a "major federal action" and a "proposal" for such action.[20]

## B. Counts One And Two: The Statutory Claims

### 1. Applicable Legal Standard Under Rule 12(b)(1)

The Federal Defendants, alleging that the plaintiffs lack standing to assert their statutory claims, seek to dismiss Counts One and Two for lack of subject matter jurisdiction. When a challenge is raised pursuant to Rule 12(b)(1) with respect to the factual basis for subject matter jurisdiction, the burden of proving the existence of subject matter jurisdiction is on the plaintiff. *See, e.g., Richmond, Fredericksburg & Potomac R. Co. v. U.S.*, 945 F.2d 765, 768–69 (4th Cir.1991), *cert. denied*, 503 U.S. 984, 112 S.Ct. 1667, 118 L.Ed.2d 388 (1992); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982). In determining whether jurisdiction exists, a court is to regard the allegations in the pleadings as mere evidence on the issue, and it may consider evidence outside the pleadings without converting the proceeding to one for summary judgment. *Id.; see also*

*Trentacosta v. Frontier Pacific Aircraft Indus.*, 813 F.2d 1553, 1558 (9th Cir.1987). The district court should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists. *Trentacosta*, 813 F.2d at 1559 (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265, (1986)). The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.

### 2. The Asserted Lack Of Standing

In Counts One and Two of the Amended Complaint, the plaintiffs allege that the Federal Defendants' "failure to intervene in the traffic review process and require compliance with access modification requirements before [the] County's approval of the POD[,]" as well as their failure "to apply the requirements of NEPA to the Short Pump Town Center proposal", constitute actionable FAHA and NEPA violations. (Complaint, ¶¶ 61–80). It is not

---

**20.** One source of guidance on the latter question is 40 C.F.R. § 1508.23, which explains that a "[p]roposal exists at that stage in the development of an action when an agency subject to [NEPA] has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated.... A proposal may exist in fact as well as by agency declaration that one exists."

In addition, 40 C.F.R. § 1508.18 explains that "[m]ajor Federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility .... Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts ... under the [APA][.]" *See also* 5 U.S.C. § 551(13). That provision also sets forth the following four categories of decision-making conduct within which "[f]ederal actions tend to fall[ ]": (1) adoption of official

policy, such as rules, regulations, and interpretations adopted pursuant to the [APA], treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially · alter agency programs; (2)[a]doption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of federal resources, upon which future agency actions will be based; (3)[a]doption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive; and (4)[a]pproval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

necessary to resolve these claims, however, because the plaintiffs lack standing to assert them.

### (a) The Legal Requirement Of Standing

■ The requirement of standing is rooted in Article III of the United States Constitution, which limits the jurisdiction of the federal courts to "cases and controversies." U.S. Const., Art. III, § 2. The basic purpose of the standing doctrine is to ensure that the plaintiff has a sufficient personal stake in the outcome of a dispute that judicial resolution of that dispute would be meaningful and appropriate. The doctrine encompasses both prudential, judicially self-imposed limits on courts' exercise of jurisdiction, as well as the less flexible core "case or controversy" requirement that is derived directly from the Constitution. *See generally Bennett v. Spear,* 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *The Friends for Ferrell Parkway, L.L.C. v. Stasko,* 282 F.3d 315, 319–20 (4th Cir.2002) (*citing Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

■ In order to satisfy the standing requirements of Article III of the Constitution, a plaintiff must demonstrate that: (1) it has suffered an injury in fact that is concrete, particularized, and imminent; (2) that injury is fairly traceable to, or caused by, the challenged action of the defendant; and (3) it is likely, rather than conjectural, that the injury will be redressed by a favorable decision. *See generally, Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81, 120

S.Ct. 693, 145 L.Ed.2d 610 (2000); *Lujan,* 504 U.S. at 560–61, 112 S.Ct. at 2136–39; *Stasko,* 282 F.3d at 320. As noted above, the plaintiff bears the burden of establishing these pre-requisites.

■ The Supreme Court has imposed an additional standing hurdle upon plaintiffs challenging agency action under the APA.[21] In this context, it is incumbent upon a plaintiff to demonstrate that its grievance falls within the "zone of interests" to be protected or regulated by the statute, or the constitutional guarantee, in question. *See generally Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) ("*ADPSO* ").[22]

■ Ordinarily, a plaintiff must claim a specific, personalized injury in order to invoke the jurisdiction of a federal court because courts do not sit to entertain generalized grievances that are shared by the public at large. *See e.g., Lujan,* 504 U.S. at 573–74, 112 S.Ct. at 2143. However, an association or organization may have standing to bring suit on behalf of its members where the following three elements are satisfied: (1) the group's members otherwise would have standing to sue as individuals; (2) the interests at stake are germane to the group's purpose; and (3) neither the claim made, nor the relief requested, requires the participation of individual members in the suit. *See e.g., (Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 342–43, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977)); *Stasko,* at 320 (*citing Laidlaw,* 528 U.S. at 181, 120 S.Ct. 693, 145 L.Ed.2d 610); *Virginia*

---

**21.** Many courts consider this "zone of interests" factor in non-APA cases as well; often, this issue influences consideration of the "prudential" concerns respecting a plaintiff's standing in a particular case. *See e.g., Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.,* 140 F.3d 478, 485 (3d Cir.1998).

**22.** This inquiry must be determined not by reference to the overall purpose of the statute in question but, instead, by reference to the particular provision(s) of law upon which the plaintiff seeks redress. *See e.g., Bennett,* 520 U.S. at 175–76, 117 S.Ct. at 1167–68 (internal citations omitted).

*Hospital Ass'n v. Baliles,* 868 F.2d 653, 662 (4th Cir.1989). With these principles in mind, it is appropriate to consider whether plaintiffs have standing to bring this lawsuit.

### (b) Whether Plaintiffs Have Standing In This Case

### (i) Taubman's Standing

As an initial matter, it is important to point out that the two plaintiffs in this case are somewhat differently situated. Specifically, Taubman is a Delaware limited partnership that maintains its principal place of business in Michigan. It has alleged no contacts with the Commonwealth of Virginia other than those which arise by virtue of its status as the majority stockholder of TRG (the entity that actually owns Regency). It has no employees or customers at Regency or anywhere else in the area where the Short Pump Town Center is to be built. At oral argument, Taubman asserted that its standing in this matter is "derivative" of TRG's standing. (Transcript, March 15, 2002, at 65). That is an overstatement because Taubman, having failed to demonstrate that it satisfies the requisites of standing, simply has no standing at all. Even if it did, however, a finding that TRG lacks standing to pursue its claims also would preclude Taubman from asserting its claims.

### (ii) Injury–In–Fact

TRG alleges two distinct injuries. First, it alleges a procedural injury on account of the Federal Defendants' failure to comply with their statutory and regulatory obligations under FHWA and NEPA. TRG contends that this failure "deprived [it] of a meaningful opportunity to participate in the planning process or in the assessment and determination of impacts [of the Short Pump Town Center project]." (Complaint, ¶¶ 4, 69).

This alleged failure also gives rise to TRG's second claim of injury, which focuses on the environmental and safety-related consequences that TRG alleges will occur if the putative I–64 access-change is not considered at this stage in the development of the Short Pump Town Center project. With respect to this second injury, TRG emphasizes that some two thousand people who work at Regency mall, and some eight million patrons of that mall, will suffer as a result of the increased traffic and pollution near Regency. (Complaint, ¶¶ 16–19, 66, 72, 80).

Each of these two alleged injuries is discussed below. Because plaintiffs have failed to allege an injury that is judicially cognizable, and because prudential considerations weigh strongly against permitting them to maintain this action, plaintiffs lack standing. This conclusion obviates the need to discuss the "causation", "redressibility", or "zone of interests" aspects of the standing inquiry.

### (c) The Procedural Injury

▇ The Supreme Court of the United States has indicated that, under certain circumstances, a litigant may be entitled to enforce procedural rights such as those embodied in statutes such as NEPA.[23] In order to have standing in this capacity—that is, in order to assert this type of an injury—a plaintiff must demonstrate that "the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *See e.g., Lujan,* 504 U.S. at 573, n. 8, 112 S.Ct. at 2143, n. 8.; *Bentsen,* 94 F.3d at 664. The United States Court of Appeals for the District of Columbia

**23.** Procedural injury suits include those such as the present case, in which the plaintiff demands preparation of an EIS pursuant to NEPA. *See Florida Audubon Society v. Bentsen,* 94 F.3d 658, 664 (D.C.Cir.1996) (*en banc*).

Circuit has explained this requirement in the following terms:

> [I]n order to show that the interest asserted is more than a mere 'general interest [in the alleged procedural violation] common to all members of the public,' . . . the plaintiff must show that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff. The mere violation of a procedural requirement thus does not permit any and all persons to sue to enforce the requirement.

*Id.* Therefore, TRG may not sue to remedy the Federal Defendants' alleged "failure to act" unless it can demonstrate some concrete and particularized injury that is the real core, or the "ultimate basis", of its stake in this suit.

■ TRG has not demonstrated any such concrete, particularized injury. To the contrary, a fair reading of the Amended Complaint, as a whole, indicates that the essence of TRG's standing is the "adverse safety, environmental and traffic impacts to the region", and to the employees and patrons of Regency, that it alleges will be an inevitable result of the construction and operation of the Short Pump Town Center.[24] (Complaint, ¶ 3). Prevention of "safety, environmental, and traffic" related negative impacts to a "region" clearly is not the type of concrete, litigant-specific interest upon which a party may base a procedural injury. *See e.g., Cane Creek Conservation Authority v. Orange Water and Sewer Authority*, 590 F.Supp. 1123, 1128 (M.D.N.C.1984) (association of residents, which had organizational purpose of preserving rural environment in their community, had no standing to challenge administrative decisions respecting construc-

tion of water supply dam and reservoir because alleged injury-in-fact, which was "only a generalized fear of the loss of the natural environment" in the affected area, was "shared in substantially equal measure by all members of the public" and, as such, was insufficient). To the contrary, such an interest is common to anyone living or working in the affected region. The federal courts are not appropriate fora in which to seek redress of generalized grievances of this sort. *See e.g., Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136; *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (internal citations omitted).

However, TRG also has proffered the alleged adverse impact to "the employees and patrons of Regency" as an injury that warrants judicial scrutiny and redress. For the reasons set forth below, however, TRG cannot properly base its standing on possible adverse effects to those who work and shop at Regency.

### (d) Injury To Employees And Patrons

■ It is well-settled that a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499–500, 95 S.Ct. at 2205–06. This limitation "on the class of persons who may invoke the courts' decisional and remedial powers" is one aspect of the doctrine of justiciability, which includes a number of judicially-imposed, "prudential" considerations that are designed to restrict the role of the federal courts in our system of separated powers. *Warth*, 422 U.S. at 499–500, 95 S.Ct. at 2205–06.

As noted above, however, the Supreme Court has carved out a limited exception

---

**24.** As noted above, the alleged chain of causation is that construction and operation of the Short Pump Town Center will result in an inevitable and dire need for a change in ac-

cess to I–64 which, when it is effected, will lead to traffic congestion and incidental safety and environmental consequences.

to this general rule in cases where an organization seeks redress for an alleged injury to some or all of its members. Under these circumstances, the organization may have standing to sue where it can demonstrate that: (1) the group's members otherwise would have standing to sue as individuals; (2) the interests at stake are germane to the group's purpose; and (3) neither the claim made, nor the relief requested, requires the participation of individual members in the suit. *See supra.*

TRG claims to be asserting the safety and health interests of, and seeking to prevent perceived harm to, persons who are employed, and who shop, at the shopping center that TRG operates. Because the interests at stake in this case are not at all "germane" to TRG's organizational purposes, however, it does not properly have standing to sue in an associational or representative capacity.

TRG owns and operates a shopping center. TRG is not a citizens group or an association with a demonstrable interest in, or commitment to, environmental or traffic-related causes or concerns.[25] In fact, through the operation of Regency, TRG (and, by virtue of its corporate parentage, Taubman) precipitates some of the very environmental and traffic-related impacts on which it seeks to fasten its standing in this action. TRG has made no showing that environmental, traffic, or general safety interests are "germane" to its organizational purposes in any judicial-

ly cognizable manner.[26] It is the burden of TRG to make that showing and its failure to satisfy that burden is fatal to its position on standing.

At oral argument, counsel for TRG correctly admitted that there were no decisions in which a court had found associational standing on the basis asserted here: the inchoate, generalized interest of retail employees and customers of a shopping mall in air quality and freedom from traffic congestion (and the safety consequences attendant thereto). Indeed, the only decision remotely related to the argument that TRG has proffered in support of its concept of standing is *Overseas Shipholding Group, Inc. v. Skinner,* 767 F.Supp. 287 (D.D.C.1991), wherein a corporate shipholding group brought a NEPA challenge to a rule that the Department of Transportation and the Maritime Administration had enacted. The plaintiff challenged the rule, in part, on the ground that, by operation thereof, the air and water environment in which its ships, crews, and other employees operated would be made more hazardous and polluted. *Id.* at 291. The United States District Court for the District of Columbia examined the plaintiff's contentions under the three-part *Hunt* "associational standing" inquiry and held that the plaintiff satisfied the test. Specifically, the court first found that the employees of the plaintiff would have standing "to challenge a rule which would make their working environment more polluted," and it stated that "courts have accepted [a]

---

**25.** Taubman owns a majority interest in TRG. Taubman is not a citizens group or an association with a demonstrable interest in environmental or traffic-related issues.

**26.** At oral argument, counsel for the County correctly identified the "organizational purpose" of Taubman in the following terms:

[W]hat is the organizational purpose of Taubman[?] It is a shopping center developer and operator. Its organizational pur-

pose is to earn income from leasing space in shopping centers. It is not an environmental organization. It is the antithesis of an environmental citizens group. In ... their complaint, Taubman alleges it draws over 8 million people a year to Regency .... Now, how do they get there? These visitors come by motor vehicle, and they bring with them noise, traffic, congestion, and pollution.

(Transcript, March 15, 2002, at 32–33).

corporate entity's ability to sue on this basis." *Id.* at 292 (internal citations omitted). Second, the court noted that neither the claims asserted, nor the relief requested, would require the presence of individual employees. *Id.* Finally, the court held that the "germaneness" element was satisfied because the plaintiff sought "to maintain a safe and healthy working environment in which to sail its ships and crews." *Id.* The court explained that, "[w]hile environmental concerns are not the guiding purpose of the corporate organization, the goal of preserving a safe working environment in the waterways is certainly pertinent, if not necessary, to [the plaintiff's] successful operation." [27] *Id.*

*Overseas Shipholding* is inapposite here. As the Federal Defendants properly have recognized, the business owner in *Overseas Shipholding* was permitted to assert its employees' interests in safe and healthy waterways because those waterways were the employees' direct working environment. In contrast, the plaintiffs in this case seek to assert the interests of employees (most of whom are not their own) in commuting to and from work on public roads, upon which thousands of non-employee citizens travel every day. Those circumstances are far removed from the situation before the court in *Overseas Shipholding;* and, as counsel for TRG has acknowledged, no court has stretched the concept of associational standing to the point to which it must be taken to confer standing on TRG or Taubman.[28] To permit the plaintiffs to sue based upon the type of injuries to employees that are alleged in the Amended Complaint would necessitate a substantial leap in logic, and an unprecedented expansion in the doctrine of standing, that the Court in not prepared to make.[29]

---

**27.** The court in *Overseas Shipholding* correctly recognized that the "germaneness requirement is 'undemanding' and requires only 'mere pertinence between litigation subject and organizational purpose.'" 767 F.Supp. at 292. That statement is true, as far as it goes, however, it cannot mean that germaneness has ceased to be a requisite element of a claim premised upon associational standing.

**28.** Without discussing in detail each of the three decisions that the *Overseas Shipholding* court cited in support of an employer's ability to sue on behalf of its employees, and for the purpose of challenging conduct that would make those employees' working environment less safe, it suffices to say that those decisions do not support plaintiffs' standing in this case.

**29.** In their briefs, the plaintiffs also cited *Committee for Auto Responsibility v. Solomon,* 603 F.2d 992 (D.C.Cir.1979), which they contend is "an analogous case", in support of their associational standing. That case involved "a challenge to the leasing by General Services Administration of the Great Plaza Area of the Federal Triangle in Washington, D.C., for use as a parking facility for employees of federal agencies." *Id.* at 996. In *Solomon,* two of the plaintiff-appellants were "organizations whose purposes include improvement of the quality of the environment ...." *Id.* at 997. Specifically, the Court explained that the first associational plaintiff, the Committee for Auto Responsibility, was "an unincorporated association whose primary purpose is to improve the quality of the human environment by promoting responsible use of automobiles and public land in ways that minimize adverse environmental effects and conserve finite resources." *Id.* at 997, n. 4. The second associational plaintiff, the Metropolitan Washington Coalition for Clean Air, was "a nonprofit corporation devoted to the preservation and enhancement of environmental values in the District of Columbia metropolitan area." *Id.* The D.C. Circuit noted that the appellants had alleged that their members lived in or near the District of Columbia and that their members "regularly traveled to educational, cultural, and recreational facilities within the immediate vicinity of the Great Plaza." *Id.* at 998. Under these circumstances, the court determined that "the prerequisites to associational standing clearly [were] met ...." *Id.* at 998, n. 13.

Contrary to plaintiffs' contention, their positions vis-a-vis their employees, those of the merchants at the mall, and the customers of

Nor has TRG cited any decision in which a court has permitted a corporation to base its standing upon the rights and interests of patrons in traveling to and from a shopping mall. That is not surprising, given that to permit TRG here to predicate its standing on the environmental or safety interests of Regency's patrons would be to turn the principles and goals underlying the standing doctrine on their head. As discussed above, the standing doctrine serves to define, and to limit, the role of the federal courts, not to open the courts' doors to issues and grievances (whether they be localized or nation-wide) the resolution of which properly is entrusted to the political branches of government. *See generally, Warth,* 422 U.S. at 498–501, 95 S.Ct. at 2205–2207. If courts allowed businesses to sue by invoking the generalized rights and interests of their patrons in the roadways that such persons travel when they go shopping, whatever limitations exist in both the doctrine of associational standing and the doctrine of justiciability would be eviscerated.

The plaintiffs here cannot premise their standing upon alleged injuries to those employed by, or who shop at, Regency because those interests are not pertinent to their organizational purposes. As a result, this injury is insufficient as a matter of law to constitute either the type of "concrete interest" upon which their claim of procedural injury must be based or the particularized injury-in-fact element of the ordinary standing inquiry.

those merchants, is not "analogous" to the relationship between the two associations and their members in *Solomon.* The crucial difference involves the requirement of "germaneness." In *Solomon,* the overriding and obvious raison d'etre of the association-plaintiffs was environmental and conservational in nature. There was no legitimate argument respecting the "germaneness" requirement in that case.

## C. The Supremacy Clause Claim

The Supremacy Clause claim in Count Three of the Amended Complaint is the only claim that the plaintiffs have brought against the County. Pursuant to Fed. R.Civ.P. 12(b)(6), the County seeks to dismiss Count Three for its failure to state a claim upon which relief can be granted. For the reasons set forth below, Count Three is dismissed.

### 1. Applicable Legal Standard Under Fed.R.Civ.P. 12(b)(6)

In considering a motion to dismiss a complaint for its "fail[ure] to state a claim upon which relief can be granted," a court must construe the complaint in the light most favorable to the plaintiffs, read the complaint as a whole, and take the facts asserted therein as true. Fed.R.Civ.P. 12(b)(6); *see, e.g., In re MicroStrategy, Inc. Securities Litigation,* 115 F.Supp.2d 620, 627–28 (E.D.Va.2000); *Higgins v. Medical College,* 849 F.Supp. 1113, 1117 (E.D.Va.1994). All reasonable inferences must be made in favor of the nonmoving party, and "a count should be dismissed only where it appears beyond a reasonable doubt that recovery would be impossible under any set of facts which could be proven." *America Online, Inc. v. Great-Deals.Net,* 49 F.Supp.2d 851, 854 (E.D.Va. 1999) (*citing Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir.1992)); *see MicroStrategy,* 115 F.Supp.2d at 627–28; *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (explaining

Here, in contrast, the overriding and obvious purpose of the plaintiffs is to operate shopping centers and to profit therefrom. Even if employees or patrons of Regency would adversely be affected by construction and operation of the Short Pump Town Center, *Solomon* does not support that "environmental, traffic, and safety" related concerns are germane to plaintiffs' organizational interests.

that complaint should be construed liberally). A motion to dismiss tests only "the sufficiency of the complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses[.]" *Republican Party*, 980 F.2d at 952; *see also Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir.1999).[30]

### 2. The Alleged Supremacy Clause Violation

The Supremacy Clause of the United States Constitution, Art. VI, § 2, cl. 2, provides that "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Paragraph eighty-five of the First Amended Complaint, which alleges the Supremacy Clause violation, states:

> Because the approval of the Short Pump Town Center POD by Henrico County with the tacit approval of the defendants will, by necessity, require a change in access to I–64, whether by modifications and improvements to the I–64/West Broad Street interchange or a new interchange at Gayton Road, regardless of FHWA's discretion to approve or deny them, the action of Henrico County taken pursuant to local law conflicts with the authority of the defendants and is contrary to 23 U.S.C. § 111.

Put another way, the gist of the Supremacy Clause claim is that "the application of the County's POD approval process, as interpreted and applied *in this situation,* conflicts directly with federal highway . . . laws, regulations, and policies[ ]" "as expressed in FAHA [because] [a]pproval of the POD before the federal defendants exercised their authority under FAHA and NEPA effectively prevents the federal defendants from complying fully with these federal laws." Plaintiff's Memorandum in Opposition to County's Motion to Dismiss, at 31. Although Count Three does not even mention NEPA, the plaintiffs' brief asserts that "approval of the POD before the Federal Defendants exercised their authority under FAHA and NEPA effectively prevents the Federal Defendants from complying fully with these federal laws." *Id.* at 31–32.

 State law is preempted by federal law by operation of the Supremacy Clause in three situations: (1) where Congress explicitly and unambiguously defines the extent to which its enactments preempt state law; (2) where, in the absence of such explicit Congressional preemption, a state law regulates conduct in a field over which Congress intended the federal government to exercise exclusive authority; and (3) where the state law actually conflicts with federal law. *See e.g., English v. General Electric Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990). In Count Three, the Amended Complaint invokes only the third basis for preemption in challenging the manner in which the Short Pump Town Center POD approval process was undertaken.

 The Supreme Court of the United States has made clear that this third basis for preemption, actual conflict between state and federal law, can arise in two distinct situations. First, actual conflict may arise "where it is impossible for a private party to comply with both state and federal requirements." Second, conflict can arise "where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *See e.g., English*, 496 U.S. at 79, 110 S.Ct. at 2275. It is clear that, in

---

**30.** Because the claims that the plaintiffs assert against the Federal Defendants are disposed of on the ground that the plaintiffs lack standing to assert them, it is not necessary to consider the legal standard by which courts determine whether summary is appropriate.

this case, the latter category of conflict is asserted as the predicate for the Supremacy Clause claim in Count Three.

■ In pressing their constitutional argument, the plaintiffs rely upon *Hill v. Florida*, 325 U.S. 538, 65 S.Ct. 1373, 89 L.Ed. 1782 (1945), in which the Supreme Court found that the construction and application of a Florida statute, which prohibited unions and their selected agents from functioning as collective bargaining agents except upon conditions fixed by the state, "circumscribe[d] the 'full freedom' of choice which Congress [in the National Labor Relations Act] said employees should possess." 325 U.S. at 541, 65 S.Ct. at 1374. Central to the Court's decision in that case was the fact that, in the NLRA itself, "Congress attached no conditions whatsoever to [employees'] freedom of choice in this respect." 325 U.S. at 541–42, 65 S.Ct. at 1374–75 (concluding that, by operation of the Florida statute, the "full freedom" of employees respecting collective bargaining "would be ... shrunk to a greatly limited freedom.").[31]

Similarly, in *Maryland v. Louisiana*, 451 U.S. 725, 747, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981), the Court explained that Louisiana's "first-use" tax, which that state imposed upon certain natural gas products brought into the state, interfered with Congress' intention that the Federal Energy Regulatory Commission should have exclusive authority to dictate to natural gas pipelines the allocation of processing costs for interstate shipments. *See id.* (explaining that "[b]y specifying that the First–Use Tax is a processing cost to be either borne by the pipeline or other owner without compensation ... or passed on to purchasers, Louisiana has attempted a substantial usurpation of the authority of the FERC ....").[32]

---

**31.** The plaintiffs also cite to *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), in which the plaintiff challenged the rates and practices of grain warehousemen who operated under federal licenses that were granted pursuant to the United States Warehouse Act. Although in *Rice,* the Court acknowledged that a "state policy may produce a result inconsistent with the objective of [a] federal statute," that case quite clearly was decided under the second situation whereby state law is preempted—that is, where Congress "preempts the field." *See* 331 U.S. at 232–238, 67 S.Ct. at 1153–56 (explaining that the unique history and powerful language of Warehousing Act eliminated the former dual system of regulation and indicated that, if a licensed warehouseman complied with Congress' requirements, "[h]e could not be required by a State to do more or additional things or conform to added regulations, even though they in no way conflicted with what was demanded of him under the Federal Act.").

*Rice* is wholly inapposite with respect to this action because plaintiffs have not argued, nor could they succeed in asserting, that, by way of any statutory scheme, Congress has preempted the field of highway or environmental regulation. *See also DeCanas v. Bica,* 424 U.S. 351, 361, 96 S.Ct. 933, 939, 47 L.Ed.2d 43 (1976) (no preemption where amendments to statute evinced "that Congress intend[ed] that States may, to the extent consistent with federal law, regulate the employment of illegal aliens.").

**32.** The plaintiffs also point to *Jerome v. United States,* 318 U.S. 101, 104, 63 S.Ct. 483, 485, 87 L.Ed. 640 (1943) and to *Kahn v. INS,* 36 F.3d 1412, 1414 (9th Cir.1994), for the proposition that "in the absence of a plain indication to the contrary, ... Congress when it enacts a statute is not making the application of [a] federal act dependent on state law." This statement is true is far as it goes, however, it has little bearing on the resolution of this case. Plaintiffs contend that "[t]he application of [the] County's POD approval process regarding Short Pump Town Center, under the existing factual and legal setting, creates a unique and different standard for highway access control in Virginia than exists in the [rest of the] nation." This conclusory assertion does not demonstrate the type of conflict with, or impairment of, federal law that may give rise to an actionable Supremacy Clause claim.

It is difficult, here, to find a conflict between the County's act in approving the POD and either FAHA or NEPA. In fact, with respect to FAHA, just the opposite seems true. Even under the statutory provision and regulations that plaintiffs cite in support of their argument under FAHA, Congress has created a scheme by which state officials would play a substantial and on-going role in planning and developing the highways that run through their states. *See e.g.,* 23 U.S.C. §§ 145(a), 114; 23 C.F.R. § 625.3(a)(2). Thus, the analysis of the Supremacy Clause issue, insofar as it is alleged to conflict with FAHA, must begin with the premise that, in FAHA, Congress actually contemplated and provided for cooperative state and federal activities.

In this case, however, the County is not participating in activities that fall within the purview of that cooperative scheme. Rather, it is exercising its planning and zoning powers to approve and to regulate local land use that does not include building or modifying a federal highway. Therefore, on its face, there is no conflict between a state law (or the application thereof) and FAHA.

Count Three alleges such conflict by virtue of the fact that, when it approved the POD and permitted the construction of the Short Pump Town Center to proceed, the County imprudently refused to face the rather obvious (perhaps even undisputed) inevitability that implementation of the developer's plans will create such severe traffic congestion (and concomitant environmental problems) that a change in access to I–64 ultimately will be necessary. The County's present failure to request such a change in access, however, does not implicate the Supremacy Clause of the Constitution because, on this record, FHWA knew that the County intended to proceed with the project and decided that, there having been no request for a change

in access to a federal highway, FAHA did not obligate it to act. That may have been a foolish decision, or even a legally erroneous one, however, it was not wrought by, or made in spite of, a conflict between state and federal law. Rather, that decision came to pass through the volition of FHWA, which is a *federal* agency. That fact is true, of course, no matter how irresponsible the County may have been in approving, without also requesting a change in highway access, a project that undeniably will lead to severe traffic congestion (the burdens of which will fall in large part upon the County's citizens). Moreover, it is true even if the County thought, as it apparently did, that the presence of such severe traffic congestion would provide the impetus for a change in access to I–64 when such a request ultimately was made.

Further, and as noted above, the requirements of NEPA are triggered only when there has been a "proposal" for "major federal action" which a federal agency must approve (or when, by virtue of federal litigation, a court so declares). In their briefs, and at oral argument, the parties hotly disputed whether, absent a formal request for change in access to I–64, FHWA had any duties pursuant to NEPA that are enforceable in federal court. Whatever else such actions may constitute, it cannot be said that either the County's submission of the revised POD or the County Planning Commission's April 25, 2001 approval of that POD, constitutes a "proposal" for "major federal action." Indeed, such a finding substantially would increase NEPA's reach with respect to local development and zoning matters. Perhaps that is why the Federal Defendants, charged by Congress with enforcing FAHA, and obligated as such to comply with NEPA, unambiguously have expressed the view that, within the meaning of those statutes, the time for preparation of an EIS has not yet come to pass.

In perspective of FHWA's assessment of that issue, to which this Court owes substantial deference, *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), it is wholly inappropriate to permit invocation of the Supremacy Clause as a vehicle for calling NEPA into play. The reason that NEPA has not been set in motion is that no one has asked for a change in access to I-64 yet and, therefore, in the view of the Federal Defendants, there has been no "proposal" for a "major federal action." Thus, as was true with respect to FAHA, the inaction of which the plaintiffs complain was created by a deliberate and considered decision of the Federal Defendants, not by a conflict between state law and NEPA. In addition, as is also the case with respect to FAHA, the Federal Defendants' decision may be foolish or incorrect but, nevertheless, it does not create a cognizable claim under the Supremacy Clause.

None of the decisional law upon which the plaintiffs rely fairly can be stretched to warrant a contrary result, and the Court has unearthed no additional authority that would support a Supremacy Clause claim here.

Accordingly, and on account of its failure to state a claim upon which relief may be granted, Count Three of the Amended Complaint is dismissed pursuant to Fed. R.Civ.P. 12(b)(6).

## CONCLUSION

As the record shows, the County approved the POD and allowed development of the Short Pump Town Center to begin in the face of compelling evidence from its consultants, its own DPW, and VDOT (which expressly refused to recommend construction of the project) that doing so would lead to severe traffic congestion. It also appears, from the record, that the County is betting that such traffic congestion will help it to obtain federal approval for a change in access to I-64. Thus, as the plaintiffs have alleged, the citizens of the County in fact eventually may face unacceptable traffic conditions that their local government officials knowingly will have imposed upon them. Moreover, as the plaintiffs also suggest, it may be that VDOT should have asked for change in access or acted to prevent the project from moving forward until the traffic problems (which have been forecast by every traffic expert who has examined the matter) are solved. Further still, it may be that the FHWA has shirked its responsibilities under FAHA and given the statute too cramped an interpretation. However, neither TRG nor Taubman has standing to litigate those issues.

And, whatever else may be said about the situation, it certainly seems illogical and irresponsible for government (the County, the Commonwealth, and Federal) to act so as to create severe traffic congestion and to do nothing to address or ameliorate that situation until it actually occurs. The responsibility for resolving the competing interests involved with those issues, however, lies with those governments, but that conduct does not present a cognizable claim under the Supremacy Clause of the United States Constitution.

For the reasons set forth above, the Federal Defendants' Motion to Dismiss is granted because plaintiffs lack standing to pursue the statutory claims presented in Counts One and Two. The County's Motion to Dismiss is granted because plaintiffs have failed to state a claim upon which relief may be granted under the Supremacy Clause.[33]

---

**33.** Count Three is dismissed with prejudice because the claim is insufficient as a matter of law. However, the dismissal of Counts One

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

and Two is without prejudice because it was necessitated by a lack of standing.